**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JONATHAN LEE GENTRY,
*Petitioner-Appellant*,

v.

STEPHEN SINCLAIR,
*Respondent-Appellee*.

No. 09-99021

D.C. No.
2:99-CV-00289-RSL

ORDER AND
AMENDED OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
November 17, 2011—Portland, Oregon

Filed August 28, 2012
Amended January 15, 2013

Before: Raymond C. Fisher, Richard A. Paez,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton

# SUMMARY[*]

## Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for murder.

The panel first determined that Gentry had exhausted his claim that counsel provided ineffective assistance by failing to present mitigating evidence at sentencing, and that the claim was not procedurally defaulted because the Washington Supreme Court adjudicated it on the merits. The panel then held that the state court's denial of the claim–because counsel's performance was not deficient–was not an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

The panel next held that Gentry did not properly exhaust certain claims under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), and that there was no cause to excuse the subsequent procedural default.

Addressing Gentry's exhausted *Napue* claim that the state knew that a witness lied about receiving a benefit for his testimony, the panel held that the state court erroneously found that the prosecution did not know that the witness had received a benefit, but there was no reasonable likelihood that the false testimony could have affected the judgment because the witness' credibility was called into question throughout

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the trial and there was other evidence supporting the conviction.

Addressing Gentry's exhausted *Brady* claims that: 1) the prosecution failed to disclose that a jailhouse witness was a paid informant, and 2) the lead detective had been fired from a previous job for misconduct and had lied to obtain search warrants in other cases, the panel held that this information was not material so as to require disclosure under *Brady*.

The panel also rejected three other claims that trial counsel was ineffective by: 1) failing to conduct an investigation that would have uncovered the same impeachment evidence supporting the *Brady* claims, 2) failing to rebut the prosecution's theory of how the crime occurred, and 3) failing to present a statistical expert to challenge the state's DNA probability statistics.

The panel held that the admission of victim impact evidence under *Payne v. Tennessee*, 501 U.S. 808 (1991), at the penalty phase did not violate the Ex Post Facto Clause or due process, because the change in evidentiary rules did not alter the elements of the crime or requirements for conviction.

The panel held that the trial court's exclusion of a juror during death qualification did not contravene federal law by permitting the exclusion on a broader basis than the "substantial impairment" standard allowed in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and *Wainright v. Witt*, 469 U.S. 412 (1985).

**COUNSEL**

Timothy K. Ford (argued), MacDonald Hoague & Bayless; Rita J. Griffith, Seattle, Washington, for Petitioner-Appellant.

Paul D. Weisser (argued), Gregory J. Rosen, Office of the Attorney General, Olympia, Washington, for Respondent-Appellee.

**ORDER**

This court's opinion, filed August 28, 2012, is amended as follows:

1. On page 9871 of the slip opinion, replace the second full paragraph, before the indented quotation, with the following:

> At the time of the murder, Jonathan Lee Gentry was free on bail and awaiting trial on a charge of first degree rape. He was staying at his brother's home near the golf course. Witnesses reported seeing a man on the golf course trail at about the time of the murder. Their descriptions led to an investigation involving Gentry, which the Washington Supreme Court described as follows:

2. On page 9872, replace the first sentence of the paragraph that begins on the bottom of the page and extends to the next page, with the following sentence:

Additionally, the State introduced scientific evidence linking Gentry to a hair found on the victim.

With the opinion as amended, the Appellant's petition for panel rehearing and petition for rehearing en banc, filed October 2, 2012, is denied. The full court has been advised of the petition for rehearing and rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. *See* Fed R. App. P. 35; 9th Cir. R. 35-1 & advisory committee note 2. No subsequent petitions for rehearing, rehearing en banc, or rehearing before the full court may be filed.

---

**OPINION**

CLIFTON, Circuit Judge:

Jonathan Lee Gentry was convicted in a Washington state court of aggravated first degree murder, with a finding of the aggravating circumstance of committing the murder to protect or conceal the identity of a person committing a crime, and was sentenced to death. The Washington Supreme Court affirmed the conviction and sentence and the United States Supreme Court denied Gentry's petition for certiorari. *State v. Gentry* ("*Gentry*"), 888 P.2d 1105, 1156 (Wash.), *cert. denied*, 516 U.S. 843 (1995). Subsequently, the Washington Supreme Court denied Gentry's petition for post-conviction relief. *In re Personal Restraint Petition of Jonathan Lee Gentry* ("*Gentry PRP*"), 972 P.2d 1250, 1271 (Wash. 1999). Through several orders, the district court denied Gentry's

petition for a writ of habeas corpus under 28 U.S.C. § 2254, and he appeals that denial to us.

One of Gentry's habeas claims is that his trial counsel was ineffective at the penalty phase for failing to investigate Gentry's psychological history and consequently failing to present mitigating evidence of dysfunction within that history. The district court determined that this claim was not exhausted before the Washington Supreme Court and, ultimately, that the claim was procedurally defaulted. We disagree with this conclusion of the district court and hold that Gentry exhausted this claim. We also hold that the Washington Supreme Court adjudicated this claim on the merits. We nevertheless affirm the district court's denial of habeas relief on this claim because the Washington Supreme Court's disposition of the claim was not an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

We are not persuaded by the other arguments Gentry sets forth. Thus, we affirm the denial of habeas relief on those claims as well.

## I.  Background

The body of 12-year-old Cassie Holden was found near a footpath just off of the main trail in a wooded area, adjacent to a golf course in Bremerton, Washington, on June 15, 1988. The victim had been missing since she had gone on a walk in the area two days earlier. She had just arrived in Bremerton on June 11 to spend the summer with her mother, although she resided in Pocatello, Idaho, with her father and stepmother.

The autopsy revealed that the victim was struck in the head with a blunt object 8 to 15 times, and that one of those blows was the cause of death. A 2.2-pound rock was found at the crime scene and believed to be the murder weapon. Although her clothing was partially removed, the autopsy did not conclusively show any evidence of sexual assault.

At the time of the murder, Jonathan Lee Gentry was free on bail and awaiting trial on a charge of first degree rape. He was staying at his brother's home near the golf course. Witnesses reported seeing a man on the golf course trail at about the time of the murder. Their descriptions led to an investigation involving Gentry, which the Washington Supreme Court described as follows:

> In August of 1988, the Kitsap County Prosecutor obtained a search warrant for the Gentry residence that produced clothing similar to that worn by the man seen on the golf course. One pair of shoes had been recently cleaned, but there were bloodstains on the shoelaces. The prosecutor also obtained a warrant for hair and blood samples from Gentry and the trial court appointed counsel to represent him in connection with the hair and blood testing. Over defense counsel's objection, the blood samples and a "Negroid" hair found on Cassie's body were subjected to several types of testing, including DNA tests. . . .
>
> The forensics tests took many months to complete. While awaiting their results, Gentry was tried and convicted on the pending rape

charge and transferred from the Kitsap County Jail to the prison at Shelton. In September of 1989, jail inmate Brian Dyste told authorities Gentry made incriminating statements while they were both in the county jail. Another inmate, Tim Hicks, subsequently reported additional incriminating statements Gentry allegedly made after his transfer to Shelton. Leonard Smith, who was also at Shelton at the time, confirmed Hicks' allegation.

*Gentry PRP*, 972 P.2d at 1254.

The State ultimately charged Gentry with first degree felony murder and first degree premeditated murder, and the State gave notice of its intent to seek the death penalty. As to the charge of premeditated murder, the State alleged three aggravating circumstances to support the death penalty: (1) the murder was committed to conceal the commission of a crime; (2) the murder was committed to conceal the identity of a person committing a crime; and/or (3) the murder was committed during the course or furtherance of a sexual assault.

At trial, the State relied on scientific evidence linking the victim with blood found on Gentry's shoe. The tests excluded Gentry and his brother as the source of the blood. The forensic scientist testified that only 0.18 percent of the Caucasian population would have blood matching all of the characteristics examined in the investigation. The victim's blood matched all of the characteristics of the blood taken from Gentry's shoe.

Additionally, the State introduced scientific evidence linking Gentry to a hair found on the victim. The forensic scientist testified that one hair found on the victim was microscopically similar to the arm hair of Gentry and his brother Edward. At the time of the murder Gentry was living at his brother's home, while his brother was at sea with the Navy. The scientist testified, however, that the evidence did not establish that the hairs came only from either Gentry or his brother; the hair could match any other African-American individual with similar hair characteristics. The scientist also testified that some other hairs found on the victim's thigh and shoe did not come from Gentry or his brother Edward.

The State also introduced testimony linking Gentry to the area where the victim's body was found. Three witnesses testified to seeing an African-American man in the area of the murder scene around the time that the victim disappeared. The first two witnesses, a mother and daughter, testified that they saw a man walking past their home, a short distance from where Gentry was living, toward the golf course. The mother later identified the man she saw as Gentry. The third witness testified seeing an African-American man who matched the description given by the mother and daughter standing just off the main trail adjacent to the golf course.

The State called inmates Dyste, Smith, and Hicks to the stand, all of whom testified about incriminating statements Gentry made to them while in prison, consistent with statements they had previously given to authorities. Dyste testified that a card game he was playing with Gentry was interrupted when Gentry was called to speak with investigators. Upon Gentry's return, Dyste testified that Gentry said "They found my hair on the bitch," and that Gentry admitted to killing the victim, but stated that "they

can't prove it." Dyste further testified that he was not given or promised anything for testifying and that he did not know Hicks or Smith.

Smith testified that while playing cards with Gentry in prison, Gentry unexpectedly stated, "I killed my girlfriend," and that Gentry proceeded to call her a "bitch." Smith testified that Hicks was also present during this statement, along with a few other inmates who were playing cards together. Smith further stated that Gentry later made similar statements in a conversation between just Smith and Gentry. Smith was cross-examined on his criminal history and his failure to come forward with Gentry's confession until a year after it happened.

Hicks, the last of the three inmates to testify, described a similar statement Gentry made while playing cards with several other inmates, including Smith. Hicks also stated that Gentry referred to the victim as a "bitch." The cross-examination of Hicks included questions about his substantial criminal history, and specifically addressed his conviction for perjury. Hicks stated in both direct and cross-examination that he was not given or promised anything for his testimony.

The jury found Gentry guilty of both felony murder and premeditated murder. The jury also found that Gentry committed the murder to protect or conceal the identity of a person committing a crime, an aggravating circumstance subjecting Gentry to the possibility of the death penalty. The jury did not find that the remaining two aggravating circumstances were proven beyond a reasonable doubt.

Prior to the penalty phase, but after the guilt phase, the Supreme Court decided *Payne v. Tennessee*, 501 U.S. 808 (1991), which removed the federal constitutional bar to the admission of victim impact evidence. As a result, the trial court determined that the victim's father would be permitted to make a statement for the penalty phase jury's consideration. [ER 248; SR 13568.] The victim's father was the State's only penalty phase witness and was briefly questioned about the victim's personality, hobbies, and aspirations, as well as the impact of her death on him. The defense did not cross-examine him.

The defense called six penalty phase witnesses: Gentry's mother, childhood friend, stepfather, two brothers, and cousin. Each testified briefly about Gentry's personality and disposition. The testimony included the fact that, at a young age, Gentry had witnessed his mother kill his father in self-defense, but none of the witnesses testified about the impact of the experience on Gentry, other than to say he never spoke about it.

At the end of the penalty phase, the jury, after deliberating for approximately five and a half hours, found insufficient mitigating factors to merit leniency and returned with its verdict for the death penalty.

On direct appeal of his conviction and sentence, Gentry raised ten issues to challenge the finding of guilt and another nine issues to challenge his death sentence.[1] The Washington

---

[1] Related to the claims he later raised in his state personal restraint petition and federal habeas petition, Gentry argued that: racism permeated the trial; victim impact evidence was improperly allowed at the penalty phase; two prospective jurors were improperly excused as part of the death

Supreme Court upheld Gentry's conviction and sentence. *Gentry*, 888 P.2d at 1156. The United States Supreme Court denied Gentry's petition for a writ of certiorari. 516 U.S. 843 (1995).

Gentry then sought collateral relief by filing a personal restraint petition ("PRP") before the Washington Supreme Court. As he had been for both his trial and direct appeal, Gentry was found to be indigent, and counsel was appointed to represent him during the PRP proceedings. The Washington Supreme Court set the deadline for the filing of the PRP for six months from the appointment of counsel.

Starting about three months before the deadline for the PRP and continuing after the filing of the PRP, Gentry's counsel filed several discovery motions that suggested a claim of ineffective assistance of counsel at the penalty phase and sought funds for investigation of Gentry's family background and for appointment of a psychiatrist or psychologist to examine Gentry. The first of these discovery motions was filed on April 8, 1996, and requested funds for the appointment of a licensed psychologist. Counsel attached the declaration of Dr. Stephen Cummings, who asserted that, after reviewing Gentry's background, it was possible that Gentry suffered from post-traumatic stress disorder and other personality defects. The Washington Supreme Court denied the motion without prejudice and specified that any refiling should include an explanation for why the appointment of a

---

qualification process; and the failure to redact the trial judge's name from the judgment in Gentry's prior conviction was unfairly prejudicial. The Washington Supreme Court rejected each of these challenges on the merits.

psychologist was relevant to his claim of ineffective assistance at the penalty phase.

Counsel followed up quickly on April 22, 1996, with a motion for appointment of an investigator and expert. The motion asserted that an examination was necessary to support the ineffective assistance of counsel claim because trial counsel was aware of Gentry's potential psychological dysfunction and the trial court had granted funding and appointed a psychologist to examine Gentry, but no examination was ever conducted. The Washington Supreme Court issued an order stating that it would decide this motion "at the same time as the personal restraint petition" and that the parties could file supplemental briefing on the issues raised in the motion "at the same time the personal restraint petition is filed."

Along with the psychiatric examination, Gentry's PRP counsel also sought funds, via a June 11, 1996, motion, to investigate Gentry's family history and child development, given the preliminary information indicating that Gentry may have suffered from learning disabilities and developmental problems. Counsel reasserted that such an investigation was in support of a claim of ineffective assistance for trial counsel's failure to conduct a complete investigation into Gentry's mental health and social background. The Washington Supreme Court did not respond to this motion directly until after the filing of the PRP, denying it at that point as moot.

Gentry filed the PRP on July 1, 1996, asserting, among other claims, ineffective assistance of counsel for "failure to investigate and present mitigating evidence at [the] penalty phase proceedings." Within the PRP, Gentry referenced

another discovery motion, filed concurrently with the PRP, asking for funds to investigate Gentry's social history and for appointment of a psychologist or psychiatrist to examine Gentry in support of the claim.[2]   This concurrent motion referenced the previously filed discovery motions and sought to amend the PRP to state an unequivocal claim of ineffective assistance for failure to investigate Gentry's mental health and background, supported by evidence that Gentry was never examined by a mental health expert before trial and that trial counsel's investigation into Gentry's social background was minimal.  The Washington Supreme Court granted the motion to amend the petition on October 20, 1997, but denied the motions for funds for discovery.  Subsequently, the Washington Supreme Court denied Gentry's PRP in its entirety.  *Gentry PRP*, 972 P.2d at 1271.

Gentry then filed a petition in federal district court seeking habeas relief pursuant to 28 U.S.C. § 2254.  After a hearing as to the exhaustion of claims raised in the federal petition, the district court ruled that two of Gentry's claims were unexhausted before the Washington Supreme Court: (1) the claim of ineffective assistance of counsel at the penalty phase for counsel's failure to investigate and present evidence of Gentry's social background and mental health; and (2) one of the *Brady* and *Napue* claims related to potential evidence of undisclosed benefits received by jailhouse witness Leonard

---

[2] Relevant to issues raised on appeal, the PRP also asserted claims of: violations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), as to impeachment evidence related to jailhouse witnesses Hicks and Dyste (and evidence of a conspiracy between Hicks and Smith); ineffective assistance for failure to investigate the background of jailhouse witnesses and for failure to utilize forensic expert testimony; and state and federal constitutional violations for the admission of victim impact testimony.

Smith for his testimony ("Smith claim"). The district court later determined that those two claims were also procedurally defaulted. The district court concluded there was no cause for defaulting on the penalty phase ineffective assistance claim, but ordered an evidentiary hearing as to cause for the Smith claim.

In preparation for the evidentiary hearing on the Smith claim, the district court permitted Gentry's counsel to depose two Department of Corrections employees but did not grant requests to depose a few other individuals. Following the evidentiary hearing, the district court determined that Gentry could not show cause for the procedural default of the Smith claim.

Gentry's federal habeas petition also asserted *Brady* and *Napue* violations as to withheld information about the other two jailhouse witnesses and the lead detective. The evidentiary hearing on the Smith claim was also used to receive evidence on these *Brady* and *Napue* claims, which the district court determined had been exhausted in state proceedings. Following the evidentiary hearing, the district court denied habeas relief as to all the remaining *Brady* and *Napue* claims.

In addition to the ineffective assistance claim mentioned above, Gentry also asserted several other ineffective assistance claims for failure to investigate and present expert testimony on crime scene evidence and forensic findings on the cause of death, failure to rebut the State's statistical evidence, failure to investigate the jailhouse witnesses and detectives, failure to redact a judgment admitted into evidence, and failure to adequately prepare, during voir dire and at the penalty phase, for victim impact evidence.

Gentry's habeas petition also asserted that admitting victim impact testimony violated the Ex Post Facto and Due Process clauses.  The district court denied habeas relief on all of these claims.

Finally, Gentry's habeas petition asserted that one prospective juror, identified as Juror 22, was improperly excluded during his trial.  The district court denied Gentry's motion for summary judgment on this claim, and later, on cross-motions on the issue, again denied Gentry's motion for summary judgment and granted the State's motion for summary judgment on the claim.

Following disposition of all of the habeas claims, the district court also denied Gentry's motions for reconsideration and for a new trial, or to amend judgment. Gentry was granted a certificate of appealability on all of the habeas claims described above.[3]

## II. Discussion

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), which applies to Gentry's petition, mandates that a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits by a state court unless the state court decision "(1) resulted in a decision that was contrary to, or involved an unreasonable

---

[3] In his opening brief, Gentry also raised two uncertified issues.  In supplemental briefing on one potential issue for certification, Gentry conceded that there is no "freestanding claim of race discrimination in this Court or the District Court below" and consequently that the claim "is not presently before this Court."  We deny certification for the uncertified issues raised by Gentry.

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

After the original briefing in this case was completed, the Supreme Court decided *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). This decision limits the scope of evidence that we may consider for some of Gentry's claims, specifically, some of the evidence proffered for the first time as part of the evidentiary hearing before the district court. After *Pinholster*, review of claims adjudicated on the merits under AEDPA must be based only on "the record that was before the state court that adjudicated the claim on the merits." *Id.* at 1398. The Court reiterated that AEDPA "demonstrate[d] Congress' intent to channel prisoners' claims first to the state courts. 'The federal habeas scheme leaves primary responsibility with the state courts . . . .'" *Id.* at 1398–99 (citation omitted) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (per curiam)). Consequently, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at 1400.

That limitation does not apply if a claim was not adjudicated on the merits by the state court because, in that event, the habeas claim is not subject to review under § 2254(d). *Id.* As a result, review of such claims is not necessarily limited to the record before the state court and may be supplemented as part of the federal habeas petition, subject to § 2254(e)(2). *Id.* at 1401 (noting that because § 2254(d) only applies to claims adjudicated on the merits, there are still areas for "discretion of federal habeas courts to consider new evidence when deciding claims that were not

adjudicated on the merits in state court"); *Stokley v. Ryan*, 659 F.3d 802, 808 (9th Cir. 2011) ("If a petitioner presents a claim that was *not* adjudicated on the merits by the state courts, federal review is not necessarily limited to the state record.").

Thus, the application of *Pinholster*'s state-record limitation for § 2254(d) review is guided by first determining whether the state court adjudicated the claim in question on the merits. *See Barker v. Fleming*, 423 F.3d 1085, 1092 (9th Cir. 2005). Where a claim is procedurally defaulted, it has not been adjudicated on the merits and is not subject to AEDPA deference. *James v. Ryan*, 679 F.3d 780, 804-05 (9th Cir. 2012).

The district court ruled that two of Gentry's claims were unexhausted and procedurally defaulted: (1) ineffective assistance of counsel for trial counsel's failure to present mitigating evidence of Gentry's mental condition at the penalty phase; and (2) *Brady/Napue* violations for evidence regarding alleged benefits received by witness Leonard Smith. We agree with the district court's disposition of the latter claim. As to the former claim, though, we disagree with the district court's determination and conclude that Gentry's claim of ineffective assistance of counsel for failure to present mitigating evidence was both exhausted before the Washington Supreme Court and adjudicated on the merits by that court. However, we ultimately affirm on that claim because we agree that habeas relief is not warranted under our AEDPA review. We also affirm the denial of habeas relief on all of Gentry's other claims.

## A. Ineffective Assistance for Failure To Present Mitigating Evidence of Mental Condition at the Penalty Phase

### 1. Exhaustion

After reviewing the record, including the many motions and declarations filed before the Washington Supreme Court, we disagree with the district court's conclusion that Gentry did not exhaust his claim of ineffective assistance based on trial counsel's failure to present mitigating evidence at the penalty phase. The district court held that the mental health claim was not factually developed and was thus unexhausted. However, there was ample discussion in the filings before the Washington Supreme Court to demonstrate that Gentry was asserting the claim, that there was factual support for the claim, and that he sought funds to further develop that factual support.

"[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 844 (1999) (concluding that "the state prisoner must give the state courts an opportunity to act on his claims" and holding that "[s]ection 2254(c) requires only that state prisoners give state courts a *fair* opportunity to act on their claims"). The federal claim is fairly presented if raised in the petition itself, an accompanying brief, or another similar document filed with that court. *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

The PRP unequivocally set out a federal claim of ineffective assistance of counsel, invoking the Sixth Amendment and the applicable standard under *Strickland v. Washington*, 466 U.S. 668 (1984). The Washington Supreme Court was thus alerted to a claim under a specific provision of the United States Constitution. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). Subheading E to this claim specifically stated an ineffective assistance claim for "Trial Counsel's Failure To Investigate And Present Mitigating Evidence At Penalty Phase Proceedings." The body under this subheading briefly described Gentry's dysfunctional family background, as well as the likelihood that Gentry had mental deficiencies. The PRP also stated, however, that further factual support for this claim would come through discovery that Gentry was at that time seeking to obtain, specifically referring to the motions to amend and for discovery funds, which were filed on the same day as the PRP.

The motions provided further factual allegations to support the specific claim and gave the Washington Supreme Court a fair "opportunity to pass upon and correct" the issue. *Baldwin*, 541 U.S. at 29 (internal quotation marks omitted). Most telling, the motions stated two factual allegations that could entitle Gentry to relief on the claim: (1) trial counsel never conducted an investigation into Gentry's family background; and (2) Gentry was never evaluated by a psychiatrist or psychologist in preparation for trial.

We thus hold that the PRP, coupled with the facts set forth in the motions directly referenced by the PRP, sufficiently exhausted the claim because it gave the Washington Supreme Court an opportunity to remedy any potential ineffective assistance by trial counsel at the penalty

phase. *Id.*; *see Scott v. Schriro*, 567 F.3d 573, 583 (9th Cir. 2009) ("All exhaustion requires is that the state courts have the opportunity to remedy an error . . . .").

## 2. Procedural Default

We also disagree with the district court's conclusion that this claim was procedurally defaulted.[4] We conclude that the Washington Supreme Court adjudicated the claim on the merits. "[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits." *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).

In its PRP decision, the Washington Supreme Court decided the substance of the claims raised in the PRP together with the issues raised in separate motions. The Court emphasized that all of the motions had been "passed to the merits." *Gentry PRP*, 972 P.2d at 1254. Consistent with this

---

[4] At different points in the briefing, both Gentry and the State have taken inconsistent positions as to the procedural default of this claim, likely motivated at least in part by the Supreme Court's intervening decision in *Pinholster*. Gentry earlier contended that "the Washington Supreme Court said in its postconviction opinion that Mr. Gentry's procedural motions were 'passed to the merits,'" but later argued that "this claim was neither defaulted nor adjudicated on the merits." Similarly, the State's initial position was that "[t]he record shows that Gentry failed to fairly present those two claims in his personal restraint petition," but more recently has evolved to an argument that "Gentry's claim was adjudicated on the merits by the Washington Supreme Court."

description, the claims and the motions were not resolved by the Washington Supreme Court on procedural grounds. Specifically, the PRP decision evaluated Gentry's stated claim for "failing to present psychological evidence in mitigation" under *Strickland* and held that the record "d[id] not support Gentry's current attorneys' claim that trial counsel neglected the issue [of obtaining a psychological evaluation of Gentry prior to trial]." *Id.* at 1262, 1264. This analysis resolved Gentry's Sixth Amendment claim on a substantive, not procedural, ground. *See Lambert*, 393 F.3d at 969.

Accordingly, our review of this exhausted claim that was adjudicated on the merits is governed by AEDPA. As discussed further below, the Washington Supreme Court did not unreasonably apply federal law under *Strickland* in denying Gentry's ineffective assistance claim for failure to present mitigating evidence.

### 3.  AEDPA Review

In order to establish ineffective assistance of counsel, a petitioner must prove both that his counsel was deficient and that the deficiency caused prejudice. To establish deficient performance, Gentry must show that counsel's performance "fell below an objective standard of reasonableness" based on "the facts of the particular case [and] viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 688, 690. To demonstrate prejudice, Gentry "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In reviewing the Washington Supreme Court's decision, we are guided by the principle that when a petitioner raises a habeas claim under *Strickland*, he must

surmount two highly deferential standards of reasonableness. *See Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) ("Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)."). "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

We conclude that the Washington Supreme Court's discussion of Gentry's ineffective assistance claim for failure to present mitigating evidence was reasonably resolved at the deficient performance prong. Failure to meet either prong is fatal to a claim and there is no requirement that the panel "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Because we determine that it was not unreasonable to dispose of this claim on the deficient performance prong, there is no need to address the prejudice prong.

The Washington Supreme Court's analysis of the claim indicates its conclusion that there was insufficient evidence on the record to support the claim that Gentry's trial counsel was deficient with regard to investigating Gentry's mental state and presenting mitigating evidence at the penalty phase. The court's analysis specifically as to the claim for failure to present mitigating psychological evidence states in full:

> Although Gentry now claims ineffective assistance of counsel at trial because no psychological expert evaluated him, the record shows trial counsel sought and obtained an order appointing psychologist Dr. Frederick Wise to evaluate Gentry in

preparation for the penalty phase. No expert testified at trial, but nothing in the record suggests trial counsel failed to obtain the authorized evaluation. Both trial counsel have submitted affidavits in support of the PRP. Although counsel's affidavits address many of the allegations in Gentry's ineffective assistance claim, they say nothing about whether Dr. Wise evaluated Gentry or why no expert testimony was presented. Gentry himself is also silent on these questions. Nor has he submitted a statement from Dr. Wise. It is possible an evaluation was performed that provided no evidence useful to the defense or that counsel were concerned about opening the door to damaging rebuttal. In any event, the record before us does not support Gentry's current attorneys' claim that trial counsel neglected the issue.

*Gentry PRP*, 972 P.2d at 1264. To analyze deficient performance, the Washington Supreme Court must have "evaluate[d] the conduct from counsel's perspective at the time" and then "judge[d] the reasonableness of counsel's challenged conduct on the facts of the particular case." *Strickland*, 466 U.S. at 689–90. The Washington Supreme Court reasonably looked to the only people with first-hand knowledge regarding the lack of supporting evidence for deficient performance: Gentry, his trial counsel, and Dr. Wise.

Trial counsel did in fact submit itemized affidavits in support of most of the claims in Gentry's PRP, but as the Washington Supreme Court noted, those affidavits "say nothing about" this particular claim. *Gentry PRP*, 972 P.2d at 1264. Notably, although the affidavits did not mention this specific ineffective assistance claim, they did discuss the other ineffective assistance claims in detail, along with Gentry's other claims.[5]  Because "counsel is strongly presumed to have rendered adequate assistance," *Strickland*, 466 U.S. at 690, it was not unreasonable for the Washington Supreme Court to conclude that trial counsel's performance was not deficient when Gentry had no evidence to indicate why the failure to present evidence of Gentry's psychological condition was unreasonable under the circumstances, particularly when trial counsel sought to support claims of deficient performance for other ineffective assistance claims.[6]

_____

[5] The affidavits discussed Gentry's claims for *Brady* and *Napue* violations related to Dyste and Hicks, conspiracy between Hicks and Smith, ineffective assistance of counsel for failure to consult with forensic experts, ineffective assistance of counsel for failure to consult with a statistics expert, ineffective assistance of counsel for failure to object to an unredacted judgment, the improper admission of victim impact testimony, and improper penalty phase jury instructions.

[6] We note, as the Washington Supreme Court did, that Gentry's *PRP counsel* repeatedly claimed that trial counsel was deficient for not conducting an examination of Gentry and presenting evidence of his psychological state at the penalty phase. *Gentry PRP*, 972 P.2d at 1264 ("[T]he record before us does not support Gentry's *current attorneys' claim* that trial counsel neglected the issue." (emphasis added)).  PRP counsel, and potential experts (none of whom had actually examined Gentry at that time), repeatedly represented that Gentry was never evaluated by a psychologist and that such an examination should have been done.  None of these statements, however, were made by anyone with firsthand knowledge of why the examination or presentation of evidence did not occur.  Moreover, as noted above, trial counsel submitted

As we recently stated, "[t]here is no clear Supreme Court case law always requiring a mental health investigation at the guilt or penalty phase." *Gonzalez v. Wong*, 667 F.3d 965, 991 (9th Cir. 2011).

Although Gentry contends that the Washington Supreme Court should have permitted a psychological examination of Gentry and an investigation into Gentry's family background, it was reasonable to deny Gentry's motions to discover this evidence because, at best, this evidence would have only supported Gentry's arguments for prejudice, the second prong of *Strickland*. In other words, evidence of Gentry's psychological condition and family background could have been used to argue for a reasonable probability of a different outcome, but that evidence would not speak directly to whether trial counsel had been deficient in their investigation of Gentry's mental and family history at the time of trial.

## B. Procedural Default on the Smith Claim

Gentry alleges violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), related to exculpatory evidence withheld by the State to impeach jailhouse witness Leonard Smith, who purportedly received benefits from the State of Oregon for his testimony ("Smith claim"). We conclude that the claim was not properly exhausted before the Washington Supreme Court and that there is no cause to excuse the later procedural default of the claim.

---

detailed affidavits which conspicuously avoided this claim alone. We thus cannot say, given our doubly deferential standard, that the Washington Supreme Court unreasonably rejected the claim because of the lack of evidence to support the deficient performance prong.

Exhaustion requires a statement of the "operative facts" that support the federal legal theory giving rise to the claim. *Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008). In the PRP, Gentry effectively admitted that there were no known operative facts to support the Smith claim. The only language in the PRP relating to Smith receiving any benefit for his testimony came in this single sentence:

> Although counsel for Mr. Gentry has been unable to uncover evidence of benefits directly provided to L.S., it now appears that L.S. had a motive to assist T.H. and had previously agreed to do so.

This sole reference appeared under the heading of the claim of *Brady* and *Napue* violations specifically as to Dyste and Hicks, but not Smith. Notably, the statement itself referred to the inability to discover any evidence of a *Brady* or *Napue* violation as to Smith. A statement that admits a lack of supporting facts does not equate to the required "statement of facts that entitle the petitioner to relief" in order to exhaust a claim. *Scott*, 567 F.3d at 582. Without any factual basis to analyze a claim, the Washington Supreme Court was not provided an opportunity to pass on the Smith claim.

Consequently, the Washington Supreme Court in fact did not address any withheld exculpatory evidence as to Smith and only discussed the claims related to Dyste and Hicks. *Gentry PRP*, 972 P.2d at 1260–63. The Washington Supreme Court's opinion only mentioned Smith in the context of Gentry's claim that Smith and Hicks conspired to frame Gentry. *Id.* at 1260, 1262.

We agree with the district court that Gentry cannot show cause for the later procedural default of the unexhausted Smith claim. The claim was procedurally defaulted one year from the time of final judgment. Wash. Rev. Code § 10.73.090. An analysis of cause and prejudice for default of a *Brady* claim mirrors the final two requirements of a *Brady* claim itself:

> "[C]ause and prejudice" [for procedural default] "parallel two of the three components of the alleged *Brady* violation itself." Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes.

*Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citations omitted).

After holding an evidentiary hearing on the Smith claim,[7] the district court applied the standard articulated in *Banks* and concluded that Gentry could not show cause because "no credible evidence has been produced that there was an express or implicit agreement to provide assistance to Smith in exchange for his testimony, or that Smith received any benefit from his trial testimony–just speculation." This finding is not clearly erroneous.

Gentry's best factual support for the Smith claim focuses on circumstantial evidence of changes to the treatment of Smith's criminal charges around the time of Smith's testimony in the Gentry trial. However, Smith consistently explained, both on cross-examination at trial and after Gentry's conviction and sentence, that there was no connection between that favorable treatment and his testimony. Moreover, the deputy prosecutor also testified at the evidentiary hearing that Smith never asked for or was offered any type of benefit for his testimony. Because there is no actual evidence of a deal for Smith's testimony, the district court's account of the evidence is not "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). The failure to prove withholding of exculpatory evidence as to Smith does not implicate *Brady* or *Napue* and thus does not satisfy the parallel requirement to show cause for default.

---

[7] The evidentiary hearing on the Smith claim was not incongruent with the holding of *Pinholster*. As an unexhausted claim not adjudicated on the merits, the Smith claim is not subject to § 2254(d) review. *Pinholster*, 131 S. Ct. at 1400. As a result, review of the claim is not necessarily limited to the record before the state court and may be supplemented as part of the federal habeas petition. *See id.* at 1401; *Stokley*, 659 F.3d at 808.

## C.  Hicks's False Testimony

The remaining claims were not procedurally defaulted and were adjudicated on the merits by the Washington Supreme Court.  Consequently, although the district court held an evidentiary hearing related to some of these claims, any evidence that was not part of the state court record is not reviewable under § 2254(d).[8]  *Pinholster*, 131 S. Ct. at 1400.

Gentry's remaining *Napue* claim[9] contends that the State knew that Hicks received a benefit for his testimony in the Gentry trial, in the form of intervention with the parole board to secure his parole, and that Hicks lied about not receiving this benefit in his testimony.  We agree with the district court that Hicks's false testimony was not material because his credibility had been substantially called into question during the course of his testimony at trial.  A *Napue* claim requires the petitioner to show that "(1) the testimony (or evidence)

---

[8] For example, Gentry asserts additional support for his *Brady* claims by pointing to the interview notes of deputy prosecutor Moran that did not quote the jailhouse witnesses as ever using the word "bitch" in recounting Gentry's confession.  He also points to the testimony of Hicks at the evidentiary hearing that he received the benefit of a facility transfer for his testimony.  Both pieces of evidence first came to light in the federal habeas proceeding.  Moran's notes were not part of the state record.  As to the prison transfer, the state record only included the transfer document and transfer order themselves, which, as the Washington Supreme Court correctly found, only indicate that Hicks was transferred so he could go to college.  *Gentry PRP*, 972 P.2d at 1261.  Moran's notes and Hicks's evidentiary hearing testimony are not reviewable by this court pursuant to *Pinholster*.

[9] The district court held that there was no *Napue* claim as to Dyste because there was no evidence that there was any false testimony.  Gentry does not challenge that ruling on appeal.

was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003).

The Washington Supreme Court concluded that there was insufficient evidence that Hicks received any real benefit from testifying because the parole board iterated other reasons for Hicks's change in parole status. Consequently, the Washington Supreme Court never reached the question of the materiality of Hicks's testimony. *Gentry PRP*, 972 P.2d at 1261–62. The district court disagreed with the Washington Supreme Court's adjudication of the first *Napue* prong, determining that Hicks did in fact receive a benefit, that the State was aware of it, and that the information could have been used to impeach Hicks.[10] The district court concluded, however, that Hicks's credibility had been seriously challenged at trial and thus the additional evidence of false testimony was immaterial. The State does not challenge the district court's ruling, with which we agree, that Hicks's testimony that he received no benefit was false or that the

---

[10] The district court thus held that the first two elements of a *Brady* violation were also met. The only issue was whether the false testimony, and withholding of the information about the benefit received, satisfied the materiality requirements of *Napue* and *Brady*.

prosecution knew it was false.[11]   The only disputed issue is that of materiality.

AEDPA does not apply to our review of the materiality of Hicks's false testimony because, as noted above, the Washington Supreme Court never reached an adjudication of the materiality prong of the *Napue* claim. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (acknowledging in the *Strickland* context that "review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong"); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (when a state court applies the wrong legal standard, federal courts "must 'resolve the claim without the deference AEDPA otherwise requires'"). Nevertheless, we conclude that there is no reasonable likelihood that Hicks's false testimony could have affected the judgment of the jury. *See Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008).

Hicks's credibility was called into question substantially throughout his testimony at Gentry's trial.  During cross-examination, defense counsel questioned Hicks extensively as to the circumstances and details of his many past crimes, including his conviction for perjury before the same trial judge that presided over Gentry's trial, and also his extensive

---

[11] Hicks communicated to the deputy prosecutor that in exchange for his testimony, he needed assistance with the parole board to ensure that he was not put back into custody as a result of recent convictions.   In response, the deputy prosecutor contacted the parole board, who within days reinstated Hicks parole. Yet on the stand, Hicks testified to the same deputy prosecutor that he received nothing for his testimony.   This testimony was actually false, and the prosecution knew it was false.  The extent to which the Washington Supreme Court determined otherwise was an unreasonable finding of fact.

history of using false names.  Hicks also admitted to seeing reports about the murder on television and reading articles about it in the newspaper before making his statement to the authorities.

The litany of crimes discussed in cross-examination indicated that Hicks was not a trustworthy individual, and the evidence that he received a benefit for his testimony only would have been consistent with that well-supported notion. Further, as Hicks had already been convicted of perjury once (before the same judge) and had admitted to his use of a variety of false identities, the jury was already under the impression that Hicks was prone to lie at any point.  On that basis, even if Gentry had an opportunity to impeach Hicks as to his false testimony regarding the denial of any benefit for testifying, that opportunity would have been cumulative of other impeachment evidence and thus immaterial.  *See Heishman v. Ayers*, 621 F.3d 1030, 1035 (9th Cir. 2010) (holding that undisclosed *Napue* evidence is cumulative and thus immaterial where the witness is already sufficiently impeached).

Additionally, Hicks's testimony was not the only evidence supporting the sole aggravating circumstance found by the jury: that the victim was murdered to conceal the identity of a person committing a crime.  Although the jury did not specifically identify the underlying crime that was concealed, as the Washington Supreme Court observed, the jury likely found that Gentry had committed sexual assault or attempted sexual assault before the murder.  *See Gentry*, 888 P.2d at 1126; *Gentry PRP*, 972 P.2d at 1255 n.1.  Hicks testified that Gentry spoke about having sex with the victim. However, the State and Gentry's forensic pathologist both provided direct evidence to support the aggravating

circumstance through their agreement that the victim's killer intended a sexual assault, a point about which Gentry's trial counsel also conceded there was "no question in anybody's mind." This expert testimony, coupled with the crime scene evidence that the victim's clothing was substantially removed, exposing her genitalia, meant that Hicks's testimony was not needed to prove the aggravating circumstance found by the jury.

We therefore determine that Gentry did not suffer prejudice at either phase as a result of Hicks's false testimony. At the guilt phase, the DNA, eyewitness, and other circumstantial evidence were more than sufficient for a jury to convict Gentry without considering the testimony of the jailhouse witnesses. *Sivak v. Hardison*, 658 F.3d 898, 914 (9th Cir. 2011) (finding no *Napue* violation at the guilt phase as a result of false testimony because "[t]here was simply too much evidence placing [the defendant] at the scene of the crime"); *see Strickler v. Greene*, 527 U.S. 263, 292-93 (1999) (finding no prejudice on a *Brady* claim because even ignoring the witness's testimony, there was other evidence in the record to support the conviction on its own).

Similarly, at the penalty phase, because Hicks was in fact exposed as a convicted liar and was questioned extensively on his other fraudulent behavior and criminal activity, there is no reasonable likelihood that a juror's judgment could have been affected by additional evidence revealing that Hicks received a benefit for his testimony. *See Sivak*, 658 F.3d at 917 (concluding that there was a *Napue* violation at the penalty phase because "this is not a case in which the witness at issue had *already been exposed to the factfinder as a liar*" (emphasis added)).

## D. Other *Brady* Claims

We are also not persuaded by Gentry's arguments in support of his other claims of *Brady* violations. The three elements of a claim for a *Brady* violation are that "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82.

Gentry asserts a *Brady* claim for the prosecution's failure to disclose the impeachment evidence that jailhouse witness Dyste was a paid informant for the county police and prosecutor's office. It is undisputed that Dyste was a paid informant for the same county detectives and prosecutors who investigated and prosecuted Gentry. *Gentry PRP*, 972 P.2d at 1261. This fact has impeachment value that would have been favorable to Gentry in trial. *See Strickler*, 527 U.S. at 281–82. We agree with the Washington Supreme Court and the district court, however, that Dyste's informant status fails to meet the final *Brady* element of materiality.

Similar to the impeachment of Hicks discussed above, Dyste's credibility was significantly called into question on the witness stand during Gentry's trial. On cross-examination, Dyste admitted that although his testimony was that Gentry stated, "[t]hey found my hair on the bitch," Dyste never actually quoted Gentry as using the word "bitch" in his original tape-recorded statement to the authorities. Instead, Dyste's original statement simply recounted that Gentry had said to Dyste that the authorities questioned Gentry about finding hairs at the murder scene matching Gentry's. Dyste also admitted on the witness stand that he did not come

forward about Gentry's confession until nine months after it happened, and only after he was arrested on a burglary charge. Defense counsel also attacked Dyste's credibility with questions about his various past crimes and with questions directed at Dyste's possible racial motives for testifying and his propensity to use racial slurs.

Viewing this evidence collectively, it was not unreasonable for the Washington Supreme Court to conclude that the jury would have returned the same verdict without the testimony of Dyste or any of the other jailhouse witnesses. Even if the impeachment evidence of Dyste's informant status had been presented to the jury, there was no "reasonable probability of a different result." *Strickler*, 527 U.S. at 291 (emphasis omitted). The cross-examination of Dyste raised reasonable doubts as to his motivation for testifying and there was sufficient impeachment evidence for the jury to question seriously the veracity of Dyste's original statement. Thus, regardless of the failure to disclose the informant status of Dyste, Gentry received "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Gentry also claims a *Brady* violation for withheld evidence that purports to show that Detective Wright, the lead detective in Gentry's case, was fired from his previous job for misconduct and that he had lied to obtain search warrants in other cases. Although this information was favorable to Gentry as it could have been used to impeach the credibility of Detective Wright for truthfulness, *see United States v. Bagley*, 473 U.S. 667, 676 (1985), we conclude that it was not unreasonable to determine that this evidence was not material.

Tangential at best, and contained mostly in newspaper articles, this evidence, even if used to impeach Detective Wright at trial, would not have created a reasonable probability of a different result either at the guilt or penalty phases. *United States v. Kerr*, 981 F.2d 1050, 1052 (9th Cir. 1992) (stating that tangential evidence is not material because it is insufficient to cast doubt on the ultimate result reached). Moreover, Detective Wright's questionable job performance was not an area completely unknown to Gentry's trial counsel. As part of a motion to suppress, trial counsel had examined Detective Wright, alleging that Wright lied in the Gentry search warrant. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (observing that *Brady* material is "information which had been known to the prosecution but unknown to the defense").

## E.  Other Ineffective Assistance of Counsel Claims

We are similarly not persuaded by Gentry's three other grounds for ineffective assistance of counsel. As noted above, a claim of ineffective assistance requires first, that counsel's performance "fell below an objective standard of reasonableness" based on "the facts of the particular case [and] viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 688, 690. The second required element is prejudice, which is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

First, Gentry asserts a claim of ineffective assistance for trial counsel's failure to conduct an investigation that would

have uncovered the same impeachment evidence he argues for in support of his *Brady* claims discussed above.

The district court was correct that *Brady* materiality and *Strickland* prejudice are the same.  *See Bagley*, 473 U.S. at 682; *United States v. Spawr Optical Research, Inc.*, 864 F.2d 1467, 1472 n.6 (9th Cir. 1988).  Gentry does not dispute that if the information about the witnesses does not constitute a *Brady* violation for lack of materiality, it will likewise not support an ineffective assistance claim.  Because we have held that none of the impeachment evidence argued in support of Gentry's *Brady* claims is material, that analysis is dispositive of the prejudice prong of an ineffective assistance claim based on the same evidence.

Second, Gentry seeks relief on the ground that trial counsel failed to rebut the prosecution's theory of how the crime occurred.  We conclude that the Washington Supreme Court reasonably applied *Strickland* to this claim and did not reach a decision contrary to it.  As the district court pointed out, trial counsel consulted with a medical expert, who assisted them in rebutting many of the assertions of the State's crime scene expert.  It was reasonable for the Washington Supreme Court to determine that this was sufficient performance under the circumstances.

Further, the Washington Supreme Court's determination of no prejudice was reasonable.  Gentry asserts that the crime scene analyst would have testified that the fatal blows were struck at a different location from what had been presented.  However, most relevant here is what the crime scene analyst could not have rebutted.  It was reasonable to conclude that even if the crime scene analyst testified, there was still no dispute that the victim was struck in the head with a rock 8 to

15 times and that one of these blows was the fatal blow. Evidence changing just how those blows were administered would not have resulted in a different outcome.

Gentry's final ineffective assistance claim is based on trial counsel's failure to present a statistical expert to challenge the DNA probability statistics presented by the State. We conclude that it was not unreasonable for the Washington Supreme Court to find that trial counsel dedicated substantial time and effort to rebutting the many facets of the DNA evidence presented. As Gentry points out, this was "the first Washington case in which DNA using Polymerase Chain Reaction (PCR) and gamma marker (GM) testing was offered into evidence in a criminal trial." Accordingly, there was not an established benchmark at the time in terms of effective counsel related to DNA evidence. Nonetheless, trial counsel spent substantial time preparing to address the various issues raised by the DNA evidence. The fact that counsel chose to focus their efforts on attacking the reliability of DNA evidence, rather than on the statistical probability of a match, seems "virtually unchallengeable" because it is "a strategic choice[] made after thorough investigation of law and facts." *Strickland*, 466 U.S. at 690.

## F. Victim Impact Evidence

Gentry argues that the admission of victim impact statements during the penalty phase violated constitutional provisions barring ex post facto laws[12] and also violated due

---

[12] Contrary to arguments made by the State, Gentry sufficiently presented his ex post facto claim for appeal. While 28 U.S.C. § 2253(c)(2) requires "a substantial showing of the denial of a constitutional right," it does not require the petitioner to list every specific

process. We address in turn each of these constitutional challenges and conclude that the admission of victim impact evidence at the penalty phase was not a constitutional violation.

## 1. Ex Post Facto

Wash. Rev. Code § 7.69.030, which allowed victim impact statements to be admitted at felony sentencing hearings, was passed in 1985, prior to Gentry's crime in 1988. However, in *State v. Bartholomew*, 683 P.2d 1079 (Wash. 1984), the Washington Supreme Court limited nonstatutory aggravating factors for capital sentencing to the "defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant." *Id.* at 1087. While victim impact statements were not explicitly mentioned in the decision, such statements were not allowed in capital sentencing proceedings thereafter because they constituted evidence falling into the nonstatutory aggravating factors category. *See id.*; *Gentry*, 888 P.2d 1105, 1137 (1995) ("[V]ictim impact evidence does not fit within any of the

---

article or amendment in order to preserve his right to appeal. The Washington Supreme Court discussed whether the admissibility of victim impact statements violated the Ex Post Facto Clause, *Gentry PRP*, 972 P.2d at 1266–67, and the district court's similar discussion demonstrates that Gentry did not "deprive[] the district court of an opportunity to address the merits of his claim." *Allen v. Ornoski*, 435 F.3d 946, 960 (9th Cir. 2006). The certificate of appealability includes a claim that "[t]he admission of victim impact testimony resulted in an unfair sentencing proceeding." While this does not address a specific clause of the Constitution, the general language encompasses issues examined by the district court, which includes the ex post facto prohibition.

categories of evidence held to be admissible during the special sentencing phase of a capital case.").

The Washington Victims' Rights Amendment, passed in 1989 after Gentry's crime, would have changed *Bartholomew*'s prohibition on victim impact statements. But Supreme Court decisions in *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989), which held that the Eighth Amendment bars the admission of victim impact evidence during the penalty phase of a capital trial, precluded the Victims' Rights Amendment from taking effect. Later, when the Supreme Court issued its decision in *Payne v. Tennessee*, 501 U.S. 808 (1991), the constitutional bar was lifted and the Washington Victims' Rights Amendment provision permitting the admission of a victim impact statement became effective.[13] *Payne* was announced after the guilt phase of Gentry's trial but before the penalty phase.

Thus, the then-newly authorized admission of victim impact statements in Washington was a result of both a state legislative act and a judicial decision by the United States Supreme Court. While the Ex Post Facto Clause applies directly to legislative acts, the Fourteenth Amendment extends Article 1, Section 10's prohibition on ex post facto laws to include judicial decisions. *Bouie v. City of Columbia*,

---

[13] Gentry's case is slightly different from cases in other circuits discussing the Ex Post Facto Clause and *Payne* because the Washington Victims' Rights Amendment was passed *prior* to the *Payne* decision instead of after *Payne*. *See Nooner v. Norris*, 402 F.3d 801 (8th Cir. 2005), *cert. denied*, 547 U.S. 1137 (2006); *Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001).

378 U.S. 347, 353–54 (1964).　We examine the Victims'
Rights Amendment and the *Payne* decision together in
determining whether the admission of victim impact evidence
here presents an ex post facto problem.　We conclude that
neither are violations of the Ex Post Facto Clause or of due
process under *Bouie*.

The Ex Post Facto Clause bars the government from
passing laws that impose a new punishment or increase
punishment for a crime committed before passage of the law.
*See Weaver v. Graham*, 450 U.S. 24, 28 (1981); *Collins v.
Youngblood*, 497 U.S. 37, 43 (1990).　The clause serves two
purposes: (1) to ensure that the legislature provides fair notice
to individuals regarding the effect of their actions, and (2) to
prevent the government from arbitrarily and vindictively
using its power to convict individuals.　*Weaver*, 450 U.S. at
28–29.

The Supreme Court has generally classified laws that
violate the Ex Post Facto Clause into four categories.[14]
*Calder v. Bull*, 3 U.S. 386, 390 (1798).[15]　The admission of

---

[14] The first three categories do not apply to Gentry's claim: (1) "Every
law that makes an action, done before the passing of the law, and which
was innocent when done, criminal; and punishes such action."; (2) "Every
law that aggravates a crime, or makes it greater than it was, when
committed."; and (3) "Every law that changes the punishment, and inflicts
a greater punishment, than the law annexed to the crime, when
committed." *Calder v. Bull*, 3 U.S. 386, 390 (1798).

[15] The Supreme Court recently stated that the *Calder* categories are still
the applicable categories in this context. *Carmell v. Texas*, 529 U.S. 513,
523–24 (2000).　The decision in *Carmell*, although issued after the
decisions in *Gentry* and *Gentry PRP*, is consistent with the distinction of
earlier Supreme Court cases we apply here between impermissible ex post
facto laws affecting the sufficiency of evidence and permissible changes

victim impact statements potentially implicates *Calder*'s fourth category: "Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Id.*[16]

Only certain types of changes in the rules of evidence fall into this fourth category. There is a violation under this category when laws that require a minimum type or amount

---

allowing for additional evidence. Relevant to that discussion, the majority in *Carmell* noted:

> Ordinary rules of evidence . . . . by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption. Therefore, to the extent one may consider changes to such laws as "unfair" or "unjust," they do not implicate the same *kind* of unfairness implicated by changes in rules setting forth a sufficiency of the evidence standard.

529 U.S. at 533 n.23 (emphasis in original).

[16] We are not persuaded by Gentry's argument that the Washington Supreme Court and the district court failed to explicitly examine the four categories of ex post facto laws as established by *Calder*. Our review looks only to the reasoning and result of the decision, not to whether Supreme Court cases were specifically discussed or cited. *Early v. Packer*, 537 U.S. 3, 8 (2002). Regardless, the Washington Supreme Court in fact relied on its decision in *State v. Ward*, 869 P.2d 1062 (Wash. 1994), which considered the four categories from *Calder* as illustrations of the "core concern" of the Ex Post Facto Clause. *Id.* at 1067 n.3. The Washington Supreme Court reasonably applied this core concern analysis to the admission of victim impact evidence and did not merely assume that evidentiary rule changes are not subject to the Ex Post Facto Clause. *Gentry PRP*, 972 P.2d at 1267.

of evidence for conviction are changed by eliminating a type of evidence or decreasing the amount of evidence needed for conviction. However, an ex post facto problem does not arise for a law that "does nothing more than admit evidence of a particular kind in a criminal case . . . which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed." *Thompson v. Missouri*, 171 U.S. 380, 387 (1898); *see Hopt v. People*, 110 U.S. 574, 589 (1884) (holding no ex post facto violation for a law allowing for convicted felons to testify as competent witnesses because the law did not affect the "quantity or the degree of proof necessary to establish . . . guilt").

While the decision in *Payne* allowed victim impact statements to be admitted, the change did not lessen the degree or amount of evidence required to impose the death sentence. The prosecution was still required to meet its burden of proving a statutory aggravating factor during the guilt phase of the trial and rebutting mitigating evidence at the sentencing phase. Wash. Rev. Code §§ 10.95.020, 10.95.030(2). The penalty phase jury was still required to weigh the victim impact statement, in conjunction with the other evidence, to determine whether that evidence was sufficient to overcome a presumption that remained the same both before and after *Payne*.[17] While allowing victim impact

---

[17] Allowing victim impact evidence also did not change the nature of the question for the penalty phase jury to answer. Washington law states that the jury should "[h]av[e] in mind the crime" when determining if the defendant merits leniency. Wash. Rev. Code § 10.95.060(4). Based on the Supreme Court's statement in *Payne* that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities," 501 U.S. at 825, the Washington Supreme Court could reasonably conclude that victim

evidence gave the prosecution an additional option in terms of the range of evidence that could be used to meet its burden, the change in law did not allow the prosecution to obtain a sentence on less evidence.

We agree with the Eighth and Tenth Circuits that the admission of a victim impact statement under *Payne* does not violate the Ex Post Facto Clause. *Nooner*, 402 F.3d at 807; *Neill*, 278 F.3d at 1053; *see also Washington v. Murray*, 952 F.2d 1472, 1480 (4th Cir. 1991). While the admission of the victim impact statement may have adversely affected Gentry's presentation at the penalty phase, the State's evidentiary burden remained the same. *See Schroeder v. Tilton*, 493 F.3d 1083, 1088 (9th Cir. 2007) (change in law admitting evidence of defendants' prior sexual offenses did not violate Ex Post Facto Clause); *Neill*, 278 F.3d at 1053 ("Despite the fact that Oklahoma's statute permitting victim impact evidence benefits only the State, . . . it does not violate the ex post facto prohibition here because it neither changes the quantum of proof nor otherwise subverts the presumption of innocence.").

## 2. Due Process

Gentry argues that he was denied due process because the admission of victim impact evidence significantly impaired his defense by: (1) denying the defense time to investigate the victim's father and (2) denying the defense the ability to voir dire jury members about victim impact testimony. We conclude that, consistent with our holding that the admission

---

impact statements were merely another form of evidence indicating the type of crime committed. *See also Nooner*, 402 F.3d at 807; *Neill*, 278 F.3d at 1053.

of victim impact evidence did not violate the Ex Post Facto Clause, it also did not constitute a due process violation.

"[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law . . . ." *Bouie*, 378 U.S. at 353. Gentry's due process claim fails for the same reasons as his ex post facto claim – the change in evidentiary rules did not alter the elements of the crime or the requirements for conviction. *Id.* at 353–54. Admitting victim impact statements did not change the elements of Gentry's crime. Gentry had sufficient notice for due process purposes that his conduct was criminal; there was no lawful conduct that was made unlawful by a retroactive reinterpretation of a statute. *See id.* at 355 (civil rights protesters who lawfully entered restaurant were convicted under trespassing statute after court reinterpreted statute to add an additional element, making protesters' conduct unlawful after the fact).

Additionally, the admission of victim impact evidence here is unlike other cases where the Supreme Court and this court have held that a due process violation occurred. The admission of victim impact evidence did not change the requirements for imposing the death penalty or prevent Gentry from arguing the fundamental elements of his defense. *See Lankford v. Idaho*, 500 U.S. 110, 121–28 (1991) (holding that the defendant's due process rights to notice were violated when a judge imposed a capital sentence even though the State took the position that it would not seek the death penalty); *Gardner v. Florida*, 430 U.S. 349, 358–62 (1977) (plurality) (holding that it was a due process violation where the judge, in issuing the death sentence against the recommendation of the jury, considered a confidential presentencing report that was not considered by the jury);

*Coleman v. McCormick*, 874 F.2d 1280, 1288 (9th Cir. 1989) (determining a due process violation where a statutory change, after Coleman's trial, required an entirely separate penalty phase trial where the presiding judge would consider aggravating and mitigating factors to warrant a capital sentence, when the presentation of mitigating factors played no role under the prior scheme).

Gentry received notice that the State would present victim impact testimony and he had the opportunity to cross-examine and test the witness; Gentry's counsel chose not to cross-examine the witness for tactical reasons. Further, Gentry's trial counsel was aware that the Supreme Court was considering the admissibility of victim impact statements in *Payne*.

Moreover, the inability to ask specific voir dire questions related to victim impact evidence did not render the trial fundamentally unfair. *See Mu'Min v. Virginia*, 500 U.S. 415, 425–26 (1991). We agree with the district court that other lines of questioning during voir dire addressed the issue of a juror's impartiality when faced with emotionally inflammatory evidence. Further, jurors' potential reactions to parental testimony, of which victim impact evidence is a subset, was part of the defense's voir dire. These lines of questioning were tantamount to "a generalized but thorough" voir dire inquiry, which was constitutionally sufficient. *Ristaino v. Ross*, 424 U.S. 589, 598 (1976).

## G.  Juror No. 22

We also affirm the denial of habeas relief on Gentry's claim that the state trial court's exclusion of prospective Juror 22 during death qualification contravened federal law by

permitting the exclusion on a broader basis than the "substantial impairment" standard allowed under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), *Wainwright v. Witt*, 469 U.S. 412 (1985), and related cases. We conclude that it was not an unreasonable application of federal law under § 2254(d)(1) for the Washington Supreme Court to determine that the Juror 22's attitude substantially impaired the performance of his duty as a juror. Moreover, in light of Juror 22's ambiguous statements at voir dire regarding his ability to follow the law, the Washington Supreme Court's decision in support of exclusion was also not an unreasonable determination of fact under § 2254(d)(2).

At voir dire, the trial court's oral examination of Juror 22 following a 24-page questionnaire yielded conflicting answers as to whether the juror could set aside his beliefs regarding capital punishment in making a decision, resulting in the prosecution moving to dismiss the juror for cause.[18] After reviewing the law on substantial impairment, the trial court stated that Juror 22 "indicated that he can impose the

---

[18] Upon initial questioning, Juror 22's responses indicated he would be willing to impose the death penalty if the law called for it. However, when the prosecution questioned whether the juror could impose the death penalty even knowing that the individual sitting before him could be put to death, the juror wavered by stating, "I don't know if I really could." Follow-up responses further indicated that Juror 22 might not be able to impose the death penalty, even if the law provided for it. When questioned by the defense attorney, Juror 22 at first responded similarly, indicating he did not think he would "ever be convinced in [his] heart" that he could impose the death penalty, but he changed his answers when presented with a scenario where both the guilt and the absence of mitigating circumstances were proven. However, in response to several questions leading up to this proffered scenario, Juror 22 stated that he found it hard to believe that the absence of mitigating circumstances could ever be proven beyond a reasonable doubt to him.

death penalty if the State meets its burden of proof," but he was "more inclined" to find mercy as a mitigating factor and was not "completely open" on the issue. Because jurors should be "down the middle of the road" as much as possible, the trial court judge determined that Juror 22's views substantially impaired his ability to follow the law.

We first address our conclusion that the Washington Supreme Court did not unreasonably apply the substantial impairment standard in upholding the exclusion of Juror 22, followed by our determination that the Washington Supreme Court did not make any unreasonable findings of fact in reaching its decision in support of exclusion.

## 1.  Reasonable Application of Law

Gentry argues that the trial court misapplied the required substantial impairment standard. A juror in a capital case is appropriately excluded where "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). When applying the "substantial impairment" standard, a juror's belief that the death penalty is unjust is insufficient grounds for exclusion, so long as the juror can set aside this belief in making a decision. *See Lockhart v. McCree*, 476 U.S. 162, 176 (1986). Although it is impermissible to exclude a juror who is not substantially impaired, a juror's bias does not have to be proved with "unmistakable clarity." *Witt*, 469 U.S. at 424 (internal quotation marks omitted). Rather, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the juror's] demeanor, [is] entitled to resolve it in favor of the State." *Id.* at 434.

Here, the trial judge did explicitly state that he found "substantial impairment" of Juror 22's duties as a juror.[19] We note that "[t]he need to defer to the trial court's ability to perceive jurors' demeanor does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses no basis for a finding of substantial impairment." *Uttecht v. Brown*, 551 U.S. 1, 20 (2007). However, the voir dire record here indicates conflicting answers and confusion on the part of Juror 22 in his ability to follow instructions regarding imposition of the death penalty. Given the discretion accorded a trial court in making its decision to exclude (and our deference to the Washington Supreme Court's adjudication of this claim under

---

[19] In full, the trial judge's explanation regarding its interpretation and application of the legal standard was as follows:

> The standard as pointed out by Mr. Moran, is whether the juror's attitude toward the death penalty will prevent or substantially impair his performance of the duties in accordance with instructions of the court and his oath, the standard in *Wainwright v. Witt*, and which I just reread.

> This gentleman indicated that he can impose the death penalty if the State meets its burden of proof, but that because of his attitude toward the death penalty, he would be more inclined to find there is mercy as a mitigating circumstance. That indicates that he isn't completely open on that question. And I guess the question then becomes, the issue becomes whether that is substantial impairment of his duties as a juror, which is to judge the case fairly. And I guess given this consequence here, I think that we need jurors that are down the middle as much as possible and I find that that's a substantial impairment and I'll sustain the challenge.

AEDPA), and when considering the content of Juror 22's answers, it was not an unreasonable application of the "substantial impairment" standard for the Washington Supreme Court to uphold the exclusion of Juror 22 based on the trial judge's statements. *See id.* (holding that the trial court was within its discretion to exclude because the record showed considerable confusion on the part of the juror).

## 2.  Reasonable Determination of Fact

We also concur with the Washington Supreme Court's determination that the trial court "did not abuse its discretion" in excluding Juror 22, deferring to the trial court's factual findings on the issue.  In determining whether juror exclusion for bias is unreasonable under the substantial impairment standard, a trial court's findings of juror partiality are entitled to special deference.  *See Uttecht*, 551 U.S. at 9 ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire . . . a factor of critical importance in assessing the attitude and qualifications of potential jurors.").

There was sufficient evidence in the record to support the trial court's conclusion that Juror 22's personal beliefs about capital punishment would prevent or substantially impair his ability to abide by his oath and follow instructions.  We see no reason to question the trial court's decision to exclude given Juror 22's multiple contradictory statements on whether he could or could not follow instructions regarding application of the death sentence.  *See Witt*, 469 U.S. at 434 (finding that ambiguity in a juror's statements must be resolved in favor of the state).

## III.    Conclusion

We disagree with the conclusion of the district court that Gentry's claim for ineffective assistance in failing to present mitigating evidence at the penalty phase was procedurally defaulted.  That claim was exhausted before the Washington Supreme Court and also adjudicated on the merits.  However, we affirm the denial of habeas relief on that claim because the Washington Supreme Court's determination that Gentry failed to establish deficient performance was not an unreasonable application of clearly established federal law and was not an unreasonable determination of fact.  We also affirm the denial of habeas relief as to the remainder of Gentry's claims.

**AFFIRMED.**