# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48677

AZAD HAJI ABDULLAH,            )
)
   Petitioner-Appellant,        )
)
v.                                 )
)
STATE OF IDAHO,            )
)
   Respondent.              )
_____ )

**Boise, June 2023 Term**

**Opinion Filed: December 5, 2023**

**Melanie Gagnepain, Clerk**

_____

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County, Cheri C. Copsey, District Judge.

The judgment and decision of the district court is <u>affirmed</u>.

Silvey Law Office, Ltd., Boise, for Appellant, Azad Haji Abdullah. Greg Silvey argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. L. LaMont Anderson argued.

_____

BRODY, Justice.

This is an appeal from the summary dismissal of Azad Abdullah's second successive petition for post-conviction relief. In 2004, Abdullah was convicted and sentenced to death for the first-degree murder of his wife, and given consecutive prison sentences for first-degree arson, three counts of attempted first-degree murder, and felony injury to a child. Abdullah's petition alleges two alternative claims: (1) the State suppressed material impeachment information pertaining to its lead investigator in violation of Abdullah's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) Abdullah's trial counsel was constitutionally ineffective in failing to discover and use the same alleged *Brady* information against the investigator at trial. Abdullah argues the district court erred in dismissing his claims because neither is time-barred or otherwise procedurally barred by Idaho Code section 19-2719(5), and neither claim fails on the merits.

1

Abdullah also challenges the district court's denial of discovery to factually support his claims.

For the reasons set forth below, we affirm the district court's summary dismissal of both claims in Abdullah's petition. First, we conclude the claims are time-barred under Idaho Code section 19-2719(5) because Abdullah's prior counsel reasonably could or should have known back in 2007 about the claims Abdullah now raises. Second, and in the alternative, we conclude that even if the factual allegations in the petition are true, and the *Brady* information could have been used to impeach the lead investigator at trial or sentencing, the *Brady* information is neither material to the guilt or penalty phase, nor was trial counsel's alleged failure to investigate the *Brady* information prejudicial. As explained below, the impeachment information primarily consists of details flowing from an affair between the lead investigator on the case and the former second-chair prosecutor. Even if the lead investigator had been impeached with the details, the record contains nothing to support a conclusion that there is a reasonable probability that the outcome of the trial or sentencing phase would have been different. Because we reach these alternative conclusions by assuming the truth of the factual allegations in the Amended Petition, Abdullah's challenge to the district court's discovery ruling is moot.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In 2004, after a trial spanning roughly two months, Abdullah was convicted and sentenced to death for the first-degree murder of his wife, Angela Abdullah ("Angie"), and given consecutive sentences totaling eighty years in prison for first-degree arson, three counts of attempted first-degree murder, and felony injury to a child. In short, during the guilt phase, the jury found beyond a reasonable doubt that "Abdullah premeditated the murder of his wife, placed a bag over her head to asphyxiate her, poured gasoline throughout their home, and left three children inside a home engulfed in flames to cover up his actions." *State v. Abdullah*, 158 Idaho 386, 495, 348 P.3d 1, 110 (2015). During the penalty phase, the same jury found the existence of aggravating circumstances, and after hearing from "[n]umerous witnesses" who "testified on Abdullah's behalf[,]" *id*. at 489–90, 348 P.3d at 104–05, found that "all mitigating circumstances were not sufficiently compelling that the death penalty would be unjust[.]" *Id*. at 464, 348 P.3d at 79.

Relevant to this appeal, Abdullah filed his third (second successive) petition for post-conviction relief on September 9, 2020. Roughly one month later, Abdullah filed an amended petition ("Amended Petition"), which was accepted by the district court. Abdullah's Amended Petition advances two alternative claims for post-conviction relief: (1) the prosecution committed

2

a *Brady* violation when it allegedly suppressed material impeachment information related to the lead investigative officer in Abdullah's case, Tod Littlefield; and (2) Abdullah's trial counsel provided ineffective assistance for failing to investigate and discover the same alleged impeachment information against Littlefield for use at trial. None of the alleged *Brady* information directly relates to the physical evidence or testimony connecting Abdullah to the charged crimes at trial—but instead flows from the details of an affair between Littlefield and the former second-chair prosecutor on Abdullah's criminal case, Erika Klein. Abdullah categorized the alleged *Brady* information into six items of information, all of which are related to the affair:

(1) "Littlefield and Klein performed sex acts in the workplace and while both were on duty, including in the 'war room' at the Ada County Prosecutor's Office, where evidence from the Abdullah case was stored, as well as in Littlefield's squad car and Klein's office";

(2) "Littlefield repeatedly defied direct orders from his superiors before and during trial, including from the police chief, to break off all contact with Klein";

(3) "Littlefield had harassed and stalked Klein after she ended their relationship, for which Klein's husband—who was a Deputy Sheriff—wished to press charges against Littlefield";

(4) "Internal Affairs opened an investigation into the relationship on August 25, 2004";

(5) "Command Staff of both the BPD and the Ada County Sheriff's Office had concerns that the affair would generate workplace violence, since both Littlefield and Klein's husband were armed"; and

(6) "Littlefield was suspended from duty on October 23, 2004, in the midst of trial."

On August 25, 2004, after Klein's husband confronted her about the affair, and roughly fourteen days before the start of jury selection for Abdullah's criminal trial, Littlefield and Klein formally, but separately, disclosed the affair to their respective superiors. Klein's superiors removed her as second-chair prosecutor the following day. *Abdullah*, 158 Idaho at 412 n.9, 348 P.3d at 27 n.9. Littlefield told his superiors that he would not contact Klein, and he was allowed to remain on the case. On September 3, 2004, five days before the start of jury selection, the lead prosecutor for Abdullah's criminal case, Patrick Owen, disclosed the fact of the affair to Abdullah's trial counsel. *Id*. One day before jury selection, Abdullah's trial counsel moved for a continuance to investigate the affair, and how it might have impacted the case. *Id*. The district court declined to continue the trial but permitted Abdullah's trial counsel to investigate and depose

Littlefield on the issue if desired. Jury selection began the next day, September 8, 2004. Abdullah's trial counsel did not investigate the details of the affair or depose Littlefield.

Before opening statements, the district court ordered personnel materials from the Boise Police Department, Internal Affairs, and Ombudsman Office to be submitted to it for an *in camera* review so that it could examine the records for discoverable *Brady* information. Relevant to this appeal, the materials submitted for review apparently included Littlefield's personnel file and internal affairs file. The district court explained that it reviewed all of the materials *in camera* by looking for "incidents suggesting basic dishonesty, a pattern of mishandling evidence and disciplinary actions involving falsifying evidence." Four days before opening statements, on September 23, 2004, the district court concluded in a written decision that the reviewed files did not contain any *Brady* information.

Over the course of the trial, the State presented physical evidence and testimony demonstrating Abdullah's guilt. The evidence showed that leading up to the underlying murder, Abdullah and Angie had a "troubled" marriage with disagreements over Abdullah's religious studies, his wanting to move the family out of the country, and the couple's finances, which resulted in Angie contemplating divorce. *Id*. at 406, 348 P.3d at 21. According to Abdullah, divorce is "extremely frowned upon in Islam, and . . . just doesn't happen." *Id*. Discussing the differences between their cultures, Abdullah also told a co-worker "it was acceptable to kill one's wife or to have the wife killed in his culture if she cheated on the husband." *Id*.

Less than two months before the crimes occurred, Abdullah purchased an insurance policy to cover vending machines used by his and Angie's part-time business, which were stored in the garage of their home. *Id*. "Although [Abdullah] was storing the vending machines at home, he was interested in only fire insurance and not theft insurance." *Id*. On October 4, 2002, the day before the crimes, Abdullah drove to Salt Lake City, Utah, with his five-year-old son. *Id*. at 407, 348 P.3d at 22. Before he left, Abdullah purchased seventeen gallons of gasoline at a Chevron station in Boise, Idaho, and five gallons of gasoline for a gas can. *Id*. Once in Salt Lake City, Abdullah purchased two red plastic gas cans, and roughly twenty minutes later, purchased an adult black cape and mask from a Halloween store even though the Abdullah family did not observe Halloween for religious reasons. *Id*. Later that day, Abdullah purchased twenty-two and a half gallons of gasoline from a 7-Eleven in Salt Lake City. *Id*. This was more than the tank capacity of Abdullah's van, "which could hold a little more than twenty-one gallons[.]" *Id*. "No one saw

4

Abdullah in Salt Lake City from approximately 8:00 p.m. on October 4, 2002, to 7:00 a.m. on October 5, 2002." *Id*.

The day before the crimes, October 4, 2002, Angie's daughter from a previous marriage had a friend spend the night at the Abdullah home. *Id*. Later that night, Angie asked her daughter and the friend to lock the doors to the Abdullah home. *Id*. Shortly after midnight on October 5, 2002, a clerk at a Chevron station in Mountain Home, Idaho, witnessed Abdullah in the Chevron store and later "told law enforcement that she was 100 percent sure Abdullah was in the store." *Id*. Shortly before 1:54 a.m. on October 5, the daughter's friend woke up because she felt heat, and then saw "fire everywhere." *Id*. The daughter and her friend narrowly escaped from the burning home through the garage. *Id*.

Expert testimony at trial established that the fire was intentionally set by pouring gasoline in the garage, living room, and southwest bedroom of the Abdullah home. *Id*. at 408, 348 P.3d at 23. Before firefighters could arrive at the scene, a neighbor, after being woken by the daughter and her friend, ran into the burning Abdullah home, kicked down the locked master bedroom door, and rescued Abdullah's and Angie's three-week-old son found crying on the bed. *Id*. After the firefighters arrived, they found Abdullah's and Angie's eighteen-month-old son in the backyard of the burning home, sitting on a large comforter from the master bedroom. *Id*. He was not covered in soot, did not smell like smoke, and did not show any signs of having been in a fire. *Id*. The firefighters also found the front door open with no signs of forced entry, even though the daughter and her friend had checked the lock before they went to bed. *Id*.

After a thermal image scan, the firefighters found Angie's body in the Abdullah home. *Id*. Angie had no clothing on except a sports bra, was face down with her backside up in the air, and had a plastic bag over her head which covered her face. *Id*. The plastic bag over Angie's head was later identified as matching bags from India Emporium—a store Abdullah had shopped at and received a similar plastic bag from only three days earlier. *Id*. After an additional toxicology examination, the State's expert opined that Angie had died before the fire from "acute fluoxetine poisoning associated with asphyxiation due to a bag over the head." *Id*. at 410, 348 P.3d at 25.

The firefighters also found a new red plastic gas can in the driveway of the Abdullah home that matched the gas can Abdullah had purchased in Salt Lake City. *Id*. at 408, 348 P.3d at 23. Expert testimony at trial later established that the gasoline in the recovered gas can contained the same additive as the gasoline Abdullah purchased in Salt Lake City. *Id*. at 409–10, 348 P.3d at 24–

25. In addition to the gas can, firefighters found a black cape at the scene identical to the one Abdullah purchased in Salt Lake City. *Id.* at 408, 348 P.3d at 23. Abdullah also could not be excluded as a minor contributor of DNA found on the cape. *Id.* at 409, 348 P.3d at 24. In sum, the evidence established that Abdullah drove to Salt Lake City on October 4, left Salt Lake City at around 8:00 p.m. to return to Boise, Idaho, murdered Angie, set the fire, and returned to Salt Lake City the next morning before 7:00 a.m. *Id.* at 407–09, 348 P.3d at 22–24.

After learning law enforcement was investigating him, Abdullah called his friend, asking that he contact Imam Din to request that Imam Din purchase two gas cans, fill them with gas, and place them in Abdullah's van. *Id.* at 409, 348 P.3d at 24. Abdullah's friend refused the request. Later, Abdullah directly contacted Imam Din to make the same request. *Id.* Imam Din also refused. *Id.* "When law enforcement took possession of Abdullah's van, it did not contain any gas cans, the cape, or the mask." *Id.* In a later interview of Abdullah, a "healing-type wound with scabs" was observed on Abdullah's left arm. *Id.* Hair samples were collected from both of Abdullah's arms, and after testing, both samples showed "exposure to high heat." *Id.*

At trial, Abdullah's counsel advanced a theory that based on the levels of fluoxetine found in Angie's blood and gastric contents, she had committed suicide on either October 4 or 5, 2002. *Id.* at 412, 348 P.3d at 27. However, in the State's rebuttal case, a forensic psychologist opined that there was a very low probability Angie committed suicide. *Id.* Similarly, Angie's therapist testified that Angie "never talked about suicide and would never have committed suicide because Angie's last husband," the father of the daughter, had committed suicide. *Id.* Earlier, a forensic pathologist who performed the autopsy also testified that he had ruled out suicide based on, among other things, the positioning of Angie's body. *Id.* at 410, 348 P.3d at 25.

After closing arguments, the jury returned a verdict finding Abdullah guilty on all six counts. *Id.* at 412, 348 P.3d at 27. Notably, during the guilt phase of the trial, Littlefield testified on six days. The bulk of his testimony was to provide foundation for items of physical or substantive evidence admitted against Abdullah, including video-taped interviews of Abdullah, and physical evidence for which Littlefield testified to the chain of custody. Littlefield did not testify as an eye-witness to any of the events related to the underlying crimes.

After the guilt phase, the penalty phase began. The State presented aggravating evidence from two witnesses: (1) Littlefield; and (2) Steven Bankhead, an inmate interviewed by Littlefield during the investigation of Abdullah. *Id.* at 412–13, 348 P.3d at 27–28. Littlefield testified that he

6

had interviewed Bankhead, and that no promises or favors were made or given in exchange for Bankhead's testimony against Abdullah. Afterwards, Abdullah's trial counsel called nine witnesses to offer testimony on mitigating circumstances. *Id.* at 413, 348 P.3d at 28. Following Abdullah's mitigation case, the State presented victim impact statements, and the parties then proceeded to closing arguments. *Id.* At the close of the penalty phase, on November 23, 2004, the jury found "the existence of two aggravating circumstances" and that all mitigating circumstances when weighed against the aggravators individually "were not sufficiently compelling to make the death penalty unjust." *Id.* Roughly four months later, on March 4, 2005, the district court sentenced Abdullah to death for the first-degree murder of Angie, and to prison sentences for felony injury to a child, arson, and the three counts of attempted murder. *Id.*

In his consolidated direct appeal and post-conviction action, Abdullah's convictions and sentences were affirmed, as was the dismissal of his petition. *See State v. Abdullah*, 158 Idaho 386, 348 P.3d 1 (2015) ("*Abdullah I*"). Prior to the release of *Abdullah I*, but after Abdullah's first post-conviction petition had been dismissed, Abdullah filed a successive petition for post-conviction relief. The dismissal of his successive petition was later affirmed on appeal. *See Abdullah v. State*, 169 Idaho 711, 503 P.3d 182 (2021) ("*Abdullah II*").

During Abdullah's 2007 post-conviction case, Abdullah filed an amended petition that included a claim of ineffective assistance of trial counsel for failure to investigate the affair between Littlefield and Klein, and "at a minimum" depose Littlefield for potential evidence related to "the affair and the impact it may have had on the investigation." Less than two months after filing that petition, on September 2007, Abdullah's first post-conviction counsel moved to depose Klein and Littlefield about the affair and its impact on the case, and also moved for an order to obtain Littlefield's personnel and internal affairs files. The district court denied Abdullah's counsel's request for the personnel and internal affairs files but concluded that it would allow counsel to depose Littlefield and Klein to investigate the affair.

More specifically, the district court issued orders allowing Abdullah's first post-conviction counsel to depose Klein and Littlefield to "determine when the affair began, if and how it impacted the investigation and prosecution of Mr. Abdullah's case, and when the State became aware of the affair." Abdullah's counsel deposed Klein and Littlefield roughly one month later, on December 18 and 19, 2007, respectively. During Klein's deposition, she testified that sometime in September or October of 2004, around the time Abdullah's trial started, she gave a verbal statement to Internal

Affairs for the Boise Police Department regarding her affair with Littlefield. Otherwise, for the period Klein was involved as the second-chair prosecutor, she denied that the affair had any impact on the investigation and prosecution of Abdullah's case.

During Littlefield's deposition, he testified he had reviewed the case files from his internal affairs file and listened to the audiotapes. According to Littlefield, the audiotapes reveal that Klein had given multiple verbal statements to Internal Affairs regarding the affair. For example, Klein had allegedly called after the guilty verdict came down, apparently stating: "If you are going to fire [Littlefield] right now, don't, because he still has to come back and testify for the sentencing phase." In addition, Klein had allegedly made a "couple of telephone calls" to Internal Affairs, apparently upset because of potential "criminal charges" against Littlefield related to the affair. Littlefield admitted to calling Klein a "couple of times" after the initial disclosure of the affair, but denied it was about the case against Abdullah.

During his deposition, Littlefield also denied being "disciplined in any way" for his affair with Klein during the period he testified at Abdullah's trial. Littlefield testified that he was first suspended, pending an investigation related to the affair, on December 7, 2004—i.e., after the conclusion of his testimony during the penalty phase. Littlefield also testified that an Internal Affairs investigation related to his affair with Klein had started prior to his suspension, but he was not sure of the exact date. Like Klein, Littlefield generally denied that his affair with Klein had any impact on his investigation of Abdullah's case. Littlefield testified that he was not terminated until March 2005—roughly four months after the guilt and penalty phases in Abdullah's trial had ended—for "conduct unbecoming of a police officer, use of police time, and use of a police vehicle" related to his affair with Klein, which occurred on-duty.

During Littlefield's deposition—and after Abdullah's counsel had already been denied access to Littlefield's personnel and internal affairs files—the decertification of Littlefield by Idaho's Peace Officer Standards and Training division of the Idaho State Police ("POST") was also discussed. Before the deposition, Littlefield had apparently "mentioned to [Abdullah's first post-conviction counsel's investigator] that [Littlefield] had been de-certified by POST at some point" after being terminated in 2005. At Littlefield's deposition in 2007, Abdullah's counsel asked for clarification, and Littlefield explained that POST investigated whether his misconduct related to the affair with Klein warranted rescinding Littlefield's officer certification. In addition, at the close of Littlefield's deposition, Littlefield offered to provide "audio recordings of messages left,"

8

and "numerous written documents and emails" related to his affair with Klein if Abdullah's counsel wanted "to see them." The record does not reflect that Abdullah's first post-conviction counsel ever requested those offered materials, or otherwise followed up with POST to request documentation or information related to Littlefield's decertification.

In August 2008, roughly one year after filing the initial petition with the ineffective assistance of trial counsel claim related to Littlefield's affair, Abdullah's first post-conviction counsel filed a final amended petition. In it, the ineffective assistance of trial counsel claim related to Littlefield's affair was removed. As noted above, in *Abdullah I*, this Court later affirmed the district court's dismissal of Abdullah's final amended petition for post-conviction relief. Five months after *Abdullah I* was decided, on August 26, 2015, the Capital Habeas Unit of the Federal Defender Services of Idaho was appointed as counsel for Abdullah.

Federal habeas counsel began an "extensive analysis" into Abdullah's case file. While investigating Abdullah's case, federal habeas counsel was aware that Littlefield had an affair with Klein that lasted until August 25, 2004, shortly before jury selection began. However, according to Abdullah's federal habeas counsel, they initially relied on the district court's findings during its *in camera* review that there was no *Brady* information in Littlefield's personnel and internal affairs files, and the lack of any *Brady* information revealed by Littlefield's and Klein's 2007 depositions, to then turn their efforts elsewhere.

Roughly five years after being appointed, in July 2020, an investigator for federal habeas counsel mentioned at a team meeting whether it was worth looking into potential misconduct by Littlefield. Abdullah's federal habeas counsel directed the investigator to "see what she could find" and the investigator "subsequently submitted an on-line public records request, not to the Boise Police Department, but to [POST] for 'any and all records on Tod Littlefield[.]' " On July 28, 2020, roughly one hour and thirty minutes after the investigator first emailed her public records request, POST responded and supplied two electronic files related to Littlefield.

One of those files, relevant to this appeal, included a Report of Decertification Investigation ("Decertification Report"), initially dated April 29, 2006, but executed four months later by a POST investigator on August 28, 2006, when the report was apparently completed. The Decertification Report reflects the six items of alleged *Brady* information as allegedly known to the prosecution team (including the law enforcement investigating Abdullah's case), before or during Abdullah's trial, in 2004. The federal habeas investigator also followed up with POST and

requested a copy of the interview a POST investigator conducted on May 1, 2006, during his investigation of Littlefield, as referenced in the Decertification Report. POST provided an audio file of the May 1, 2006, interview, and federal habeas counsel later had the interview (which was not taken under oath) formally transcribed. (The 2006 Decertification Report and the transcribed POST interview are collectively referred to below as "the POST materials.")

On September 9, 2020, before *Abdullah II* was released, Abdullah's state-appointed post-conviction counsel filed a third (i.e., second successive) petition for post-conviction relief based on alleged *Brady* information as reflected in the POST materials. One month later, Abdullah filed the underlying Amended Petition, and alleged that the six items of information related to the affair, as reflected in the POST materials, constituted material impeachment information against Littlefield suppressed in violation of *Brady*. The Amended Petition also includes a claim connected with, but alternative to, the *Brady* claim: that Abdullah's trial counsel provided constitutionally ineffective assistance for failing to investigate and discover the same alleged *Brady* information for use at trial against Littlefield. The factual basis for the truth of the alleged *Brady* information comes solely from the POST materials.

The State answered the Amended Petition and filed a motion for summary dismissal. The State argued that Abdullah's *Brady* and ineffective assistance claims were either time-barred or otherwise procedurally barred by Idaho Code section 19-2719(5), and even if the district court reached their merits, the claims still failed. In support of its motion to dismiss, the State supplied, among other things, an affidavit from the Deputy Chief of the Boise Police Department, Ron Winegar. Winegar swore that in reviewing Littlefield's personnel and internal affairs files, he observed a memorandum dated December 7, 2004, which placed Littlefield on suspension with pay status that same day. The personnel and internal affairs files related to Littlefield from the *in camera* review prior to trial, and the files reviewed by Winegar, have never been disclosed to Abdullah and are not in the record on appeal. After the State filed its motion for summary dismissal, Abdullah also filed a motion for discovery to gather factual support for his claims. However, roughly two months later, on December 8, 2020, the district court denied Abdullah's motion for discovery and reasoned, among other things, that the need for discovery would be moot if the district court later granted the State's motion for summary dismissal.

After a hearing on the State's motion for summary dismissal, in January 2021, the district court granted the State's motion and summarily dismissed both claims in the Amended Petition.

10

In dismissing the claims, the district court provided multiple independent grounds for its decision. In sum, the district court reasoned that Abdullah's claims were time-barred under Idaho Code section 19-2719(5)(a) as the claims were known or reasonably could have been known in 2007 by Abdullah's prior counsel during Abdullah's first post-conviction proceeding; that the *Brady* claim is facially insufficient because section 19-2719(5)(b) bars successive petitions based solely on information that is only impeaching; that Abdullah failed to support his Amended Petition with admissible evidence to provide a factual basis for his claims (i.e., the POST materials were not admissible evidence); and that even if the claims in the Amended Petition were supported by admissible evidence, the information reflected by the POST materials was not impeachment evidence, suppressed by the prosecution, or material for purposes of establishing a *Brady* violation. Abdullah timely appealed the summary dismissal and denial of discovery.

## II.     STANDARD OF REVIEW

"Whether a successive petition for post-conviction relief was properly dismissed pursuant to I.C. § 19–2719 is a question of law. This Court reviews questions of law de novo." *Dunlap v. State*, 159 Idaho 280, 292, 360 P.3d 289, 301 (2015) (citations omitted). When reviewing a summary dismissal based on Idaho Code section 19-2719, "the proper standard of review this Court should utilize is to directly address the motion, determine whether or not the requirements of section 19-2719 have been met, and rule accordingly." *Id*. (quoting *Stuart v. State*, 149 Idaho 35, 40, 232 P.3d 813, 818 (2010) (citation omitted)).

The standard of review in post-conviction cases when summary dismissal is granted is akin to the standard of review in civil cases when summary judgment is granted:

> In determining whether a motion for summary disposition is properly granted, a court must review the facts in a light most favorable to the petitioner, and determine whether they would entitle petitioner to relief if accepted as true. A court is required to accept the petitioner's unrebutted allegations as true, but need not accept the petitioner's conclusions. The standard to be applied to a trial court's determination that no material issue of fact exists is the same type of determination as in a summary judgment proceeding.

*State v. Hall*, 163 Idaho 744, 815, 419 P.3d 1042, 1113 (2018) (quoting *Saykhamchone v. State*, 127 Idaho 319, 321, 900 P.2d 795, 797 (1995)).

## III.     ANALYSIS

In this second successive post-conviction action brought by Abdullah, the district court summarily dismissed Abdullah's *Brady* and ineffective assistance claims in the Amended Petition

11

on four alternative and independent grounds. First, Abdullah offered no admissible evidence in support of his Amended Petition that could provide a factual basis for the claims. Second, the claims were time-barred under Idaho Code section 19-2719(5)(a) because each reasonably "could" or "should" have been known by Abdullah's first post-conviction counsel in 2007. Third, the claims were subject to dismissal as "facially insufficient" under Idaho Code section 19-2719(5)(b) because they alleged matters that are only "impeaching." Fourth, the *Brady* claim otherwise fails on the merits. Abdullah assigns error to each of the district court's grounds for summary dismissal and its denial of his motion for discovery.

For the reasons discussed below, we assume the truth of the facts supporting the *Brady* and ineffective assistance of trial counsel claims and the admissibility of the POST materials as providing a factual basis for the claims, and affirm the district court's summary dismissal of Abdullah's petition on two independent and alternative grounds: (1) the *Brady* and ineffective assistance claims are time-barred by section 19-2719(5)(a) as they reasonably "could" or "should" have been known by first post-conviction counsel in 2007; and (2) even if the claims are not time-barred, both fail on the merits. Because of our rulings, we need not reach whether the "impeachment" language in section 19-2719(5)(b) provides another independent ground to affirm summary dismissal. Furthermore, because we affirm by assuming the truth of all factual allegations underlying the claims in the Amended Petition, we do not address whether the district court erred in denying Abdullah's motion for discovery because the issue is moot.

A. **The *Brady* and ineffective assistance claims are time-barred under Idaho Code section 19-2719(5)(a) because they reasonably "should" or "could" have been known in 2007.**

The alternative *Brady* and ineffective assistance claims are based on six items of information reflected in the POST materials, all of which "center around Detective Littlefield's insubordination" and "discipline during trial." The six items Abdullah contends were material impeachment evidence suppressed by the prosecution and the district court, or that trial counsel was ineffective for failing to discover, are:

(1) "Littlefield and Klein performed sex acts in the workplace and while both were on duty, including in the 'war room' at the Ada County Prosecutor's Office, where evidence from the Abdullah case was stored, as well as in Littlefield's squad car and Klein's office";

(2) "Littlefield repeatedly defied direct orders from his superiors before and during trial, including from the police chief, to break off all contact with Klein";

12

(3) "Littlefield had harassed and stalked Klein after she ended their relationship, for which Klein's husband—who was a Deputy Sheriff—wished to press charges against Littlefield";

(4) "Internal Affairs opened an investigation into the relationship on August 25, 2004";

(5) "Command Staff of both the BPD and the Ada County Sheriff's Office had concerns that the affair would generate workplace violence, since both Littlefield and Klein's husband were armed"; and

(6) "Littlefield was suspended from duty on October 23, 2004, in the midst of trial."

Abdullah argues the district court erred in holding that the time-bar in Idaho Code section 19-2719(5)(a) precludes his two claims because "there is no evidence in the record to support any inference" that any of his prior defense counsel knew, could have known, or should have known, about the above-referenced impeachment information against Littlefield. Abdullah also makes a passing challenge to the constitutionality of the time-bar itself in Idaho Code section 19-2719(5). In response, the State maintains that both claims are time-barred because, in 2007, Abdullah's first post-conviction counsel reasonably could or should have known about the alleged impeachment information based on: the State's disclosure of Littlefield's affair with Klein before trial; the discovery Abdullah's first post-conviction counsel was granted to investigate the affair in 2007; and Littlefield's disclosure to post-conviction counsel during his 2007 deposition that, independent from Internal Affairs, POST had investigated and decertified Littlefield. To the extent Abdullah challenges section 19-2719(5)(a) as unconstitutional, the State responds that this Court has repeatedly upheld this time-bar as constitutional. For the reasons set forth below, we agree with the State.

Generally, the Uniform Post-Conviction Procedure Act ("UPCPA"), I.C. §§ 19-4901 to 19-4911, governs post-conviction proceedings. *Pizzuto v. State*, 149 Idaho 155, 160, 233 P.3d 86, 91 (2010). However, in capital post-conviction cases, Idaho Code section 19-2719 controls to the extent it conflicts with the provisions of the UPCPA. *Id.*; *Fields v. State*, 155 Idaho 532, 535, 314 P.3d 587, 590 (2013). Section 19-2719 requires a defendant in a capital case to petition for relief within certain time limitations in both his original and successive actions. *See id.*

In a capital case, Idaho Code section 19-2719(3) requires that the defendant file "any legal or factual challenge to the sentence or conviction that is known or reasonably should be known" within forty-two days "of the filing of the judgment imposing the punishment of death, and before the death warrant is filed[.]" This initial limitation applies to challenges raised on direct appeal

13

and through a petition for post-conviction relief. I.C. § 19-2719(4). Failure to comply with this initial time limitation will result in a waiver of any claims for relief "as were known, or reasonably *should* have been known." I.C. § 19-2719(5) (emphasis added). This Court "strictly construes" the time limitations for bringing claims for relief set out under Idaho Code section 19-2719. *See Dunlap v. State*, 141 Idaho 50, 57, 106 P.3d 376, 383 (2004).

Importantly, Idaho Code section 19-2719(5) contains a narrow exception to the waiver provision for "unusual cases." *State v. Rhoades*, 120 Idaho 795, 807, 820 P.2d 665, 677 (1991). This narrow exception, however, places a heightened burden on the petitioner in a successive petition case to make a prima facie showing that the "issues" raised in it "were not known or *could not reasonably have been known*." I.C. § 19-2719(5)(a) (emphasis added); *see Fields*, 154 Idaho at 350, 298 P.3d at 244; *Pizzuto*, 149 Idaho at 160, 233 P.3d at 91. In addition, a successive petition must contain a "precise statement" of the alleged issues together with the support of "material facts stated under oath or affirmation by credible persons with first hand [sic] knowledge that would support the issue or issues asserted." I.C. § 19-2719(5)(a). "A pleading that fails to make a showing of excepted issues supported by material facts, or which is not credible, must be summarily dismissed." *Id*. The burden is on the petitioner to show the issues in a successive petition reasonably could not or should not have been known at a prior time. *Abdullah II*, 169 Idaho at 729, 503 P.3d at 200.

"This Court has repeatedly held that I.C. § 19–2719 requires the dismissal of successive petitions for post-conviction relief which fail to qualify for the narrow exception set forth in I.C. § 19–2719(5)." *Pizzuto v. State*, 134 Idaho 793, 797, 10 P.3d 742, 746 (2000). "[E]ven if the State violated a petitioner's right to due process by withholding evidence, the petitioner [is still] required to raise this issue, like other constitutional issues, within the time frame mandated by I.C. § 19-2719." *Porter v. State*, 136 Idaho 257, 261, 32 P.3d 151, 155 (2001); *McKinney v. State*, 133 Idaho 695, 706–07, 992 P.2d 144, 155–56 (1999) (stating this time-bar principle in the context of a *Brady* claim). Thus, the pertinent inquiry under the time-bar question here is not whether the State suppressed the alleged *Brady* information reflected in the POST materials (that is a question on the merits)—but whether the same information giving rise to the *Brady* claim reasonably "should" or "could" have been known by Abdullah's first post-conviction counsel during their 2007 investigation into Littlefield's affair with Klein.

14

In *Porter v. State*, we held that undisclosed *Brady* evidence, including officer training and experience information and other statistical information alleged to be exculpatory, reasonably could have been known during the four years Porter litigated his first post-conviction action. 136 Idaho at 261–62, 32 P.3d at 155–56. We noted that Porter's appellate counsel in his second post-conviction relief case, in order to discover and obtain the alleged *Brady* information, "merely" wrote a letter, spoke with a sheriff, and otherwise requested certain information from a public agency who supplied the requested information that same day. *Id*.

Here, the situation is nearly the same. In July 2007, Abdullah's first post-conviction counsel asserted a claim that trial counsel were ineffective for failing to investigate the affair between Klein and Littlefield. The claim was later abandoned when Abdullah filed the final version of his first petition for post-conviction relief in August 2008, roughly one year later. However, prior to that, in late 2007, after denying his first post-conviction counsel's request that the State produce the personnel and internal affairs files on Littlefield, the district court granted counsel's request to depose Klein and Littlefield. The district court issued discovery orders permitting Abdullah's counsel to depose the pair to "determine when the affair began, if and how it impacted the investigation and prosecution of Mr. Abdullah's case, and when the State became aware of the affair."

During Klein's deposition in December 2007, there was no discussion of POST, and nothing indicating Klein knew of the POST investigation of Littlefield. In contrast, at Littlefield's deposition the following day, the POST investigation and decertification of Littlefield for his misconduct related to the affair was explicitly disclosed to Abdullah's counsel:

[FIRST POST-CONVICTION COUNSEL:] After you disclosed the affair, how long did you remain employed at the Boise Police Department?

[LITTLEFIELD:] I'll explain this. A year and several months.

[FIRST POST-CONVICTION COUNSEL:] Okay. Could you explain that?

[LITTLEFIELD:] Yeah. I was initially terminated, I believe on like the 23rd or 24th of March of 2005. And then there was the union, you know, back and forth. And ultimately I resigned on the 30th of September 2005.

[FIRST POST-CONVICTION COUNSEL:] Okay. And was this resignation, was this directly I [sic] of the affair?

[LITTLEFIELD:] Yeah, it was resign or get fired.

[FIRST POST-CONVICTION COUNSEL:] But there weren't other reasons for this resign or get fired? I mean, other performance related?

15

[LITTLEFIELD:] No. It was this.

[FIRST POST-CONVICTION COUNSEL:] Okay. *I think you mentioned to our investigator that you had been de-certified by POST at some point?*

[LITTLEFIELD:] *Yes.*

[FIRST POST-CONVICTION COUNSEL:] What does that mean? I'm not sure what that means.

[LITTLEFIELD:] Any time—it's, I believe, a law in the State of Idaho that any time an officer separates from a department without it being a retirement, or moving on to another department, the State makes [an] inquiry, or they might even order the department to furnish information as to why. *And from that the State conducts an investigation and makes a determination on whether or not you are going to lose your POST certification.*

[FIRST POST-CONVICTION COUNSEL:] *So this is an investigation independent from the Internal Affairs investigation?*

[LITTLEFIELD:] *If you want to call it that. I think they read the report and make it. I don't know if they talked to anybody. I never requested.* And I stipulated to— basically, their attorneys called me and said, "If you don't stipulate, it will court [sic] and you will have to pay the costs." From what they told me, it could be 10,000 bucks. And I didn't have 10,000 bucks laying around, so I stipulated.

(Emphasis added.)

Despite this disclosure, Abdullah's first post-conviction counsel never asked follow-up questions to Littlefield about the POST investigation or decertification. The transcript also reflects that prior to his deposition, Littlefield had spoken with an investigator for Abdullah's first-post conviction counsel—and disclosed the same information about the POST investigation and decertification at that time. In support of the Amended Petition, Abdullah has submitted no evidence that either his first post-conviction counsel, or their investigator, ever requested information from POST on Littlefield. Abdullah has also provided no testimony or evidence to suggest that had his first post-conviction counsel or their investigator requested POST information in 2007—like Abdullah's federal habeas counsel did thirteen years later in 2020—the POST materials would not have been publicly available and disclosed. Based on this, Abdullah's first post-conviction counsel reasonably could or should have known about the information forming the basis of his *Brady* claim in 2007. Thus, the *Brady* claim is time-barred.

Turning to Abdullah's alternative ineffective assistance of trial counsel claim for failure to investigate the affair and discover the impeachment information against Littlefield, it factually relies on the same information as the *Brady* claim. Thus, it is time-barred by section 19-2719(5)(a)

16

for the same reasons the *Brady* claim is deemed waived. Moreover, an early version of Abdullah's first post-conviction petition filed in 2007 contained a similar ineffective assistance of trial counsel claim related to Littlefield's affair—but was voluntarily abandoned. The ineffective assistance claim that was initially pled related to the affair but did not specify the six items of alleged *Brady* information flowing from the affair as discovered in the POST materials:

> 11. Trial Counsel Was Ineffective for Failing to Investigate the Affair Between Erika Klein and Todd [sic] Littlefield[.]
>
> . . . .
>
> Trial counsel's failure to investigate the affair was ineffective and resulted in prejudice to Mr. Abdullah. The affair took place during the course of the investigation and prosecution of Abdullah for a capital offense. Any possible collusion between Ms. Klein and Mr. Littlefield is certainly relevant, particularly where there were issues raised with regard to destruction of important pieces of evidence. Moreover, at a minimum, impeachment evidence could have been obtained through a deposition of Detective Littlefield, who was a key state witness. The failure to conduct the deposition was not clearly reasonable, as Detective Littlefield was a key player in Mr. Abdullah's investigation and prosecution; he was not an unimportant witness in this case.
>
> In addition, trial counsel was ineffective for failing to seek to depose Mr. Owen, Ms. Klein and/or Mr. Bower about the precise time that the district attorney's office became aware of the affair and removed Ms. Klein from the case. Notably, on the morning of September 7, 2004, Shawna Dunn, a deputy prosecutor, was present in lieu of Ms. Klein. If the district attorney's office had truly *just* discovered the need to remove Ms. Klein from this case, it is difficult to understand how quickly Ms. Dunn could become so well-versed in the facts of Mr. Abdullah's case without more than the week notice the state purports to have had to address the matter.
>
> Obviously, the one-week delay by the State in informing trial counsel and the court of this issue was highly prejudicial where the State disclosed this important information the day jury selection began. By delaying disclosure, the State ensured that trial counsel would be preoccupied with trial preparation and jury selection, and would not have sufficient time to conduct an adequate investigation into the affair and the impact it may have had on the investigation.

Although the framework for the ineffective assistance claim related to impeachment information flowing from the affair was already set—with notice of the POST materials as reasonably available to color in details—first post-conviction counsel voluntarily abandoned the ineffective assistance claim. One year after filing the early petition with the claim, in August 2008, first post-conviction counsel filed Abdullah's final amended petition—and in it, removed the ineffective assistance claim related to the affair. Abdullah cannot raise what is essentially the same

17

ineffective assistance of trial counsel claim, based on information that reasonably could or should have been known in 2007, when a claim for trial counsel's failure to investigate and discover the details of Littlefield's affair was voluntarily abandoned in a prior post-conviction proceeding. *Cf. Charboneau v. State*, 162 Idaho 160, 172–73, 395 P.3d 379, 391–92 (2017) (explaining that a petitioner cannot raise the same issue of an alleged recantation over thirteen years later based upon the same statements of a witness made in a different or new form).

To argue his first post-conviction counsel reasonably could not have known about the alleged *Brady* information forming the basis of his current claims, Abdullah relies on *Banks v. Dretke*, 540 U.S. 668, 691 (2004), for the proposition that his prior counsel had no obligation to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed[.]" Abdullah further relies on *Amadeo v. Zant*, 486 U.S. 214 (1988), *Strickler v. Greene*, 527 U.S. 263 (1999), and *State ex rel. Clemons v. Larkins*, 475 S.W.3d 60 (Mo. 2015), for the related proposition that his prior counsel could not reasonably have known about the alleged *Brady* information because it was "concealed" by the State—making the information not "reasonably available" or knowable during his first post-conviction action. For the reasons below, Abdullah's reliance on these federal and state habeas cases is misplaced.

*Banks* explains that due process forbids a system which requires a defendant to scavenge for hints of undisclosed *Brady* information in the context of determining whether the information is suppressed for purposes of the merits of a *Brady* claim. *See* 540 U.S. 695–96. Here, the time-bar inquiry under Idaho Code section 19-2719(5)(a) is fundamentally different. Under section 19-2719(5)(a), the question is whether the claim for relief—meritorious or not—reasonably could or should have been known by the defendant or his counsel during the time to bring a prior petition. If the claim for relief reasonably could or should have been known, then the claim is waived. I.C. § 19-2719(5). Indeed, if this time-bar standard were equivalent to performing a suppression analysis on the merits of a *Brady* claim—the time-bar would have no teeth.

In *Amadeo*, the prosecutor's memorandum supporting the petitioner's constitutional challenge to the composition of his jury was not "reasonably available" or "readily discoverable" during state court proceedings because nothing about the favorable memorandum showed it was reasonably available or discoverable through a public records request. *See* 486 U.S. at 223–24 (reaching this conclusion in the context of the "cause and prejudice" standard for petitioners seeking federal habeas relief on procedurally defaulted constitutional claims). Instead, the

18

memorandum was fortuitously discovered "within a stack of materials" during a "sweeping investigation of 20 to 30 years' worth of jury lists" and was found "handwritten, unsigned, unstamped, and undesignated—physical characteristics that strongly belie the notion that the document was intended for public consumption." *Id*. at 224.

In *Clemons*, "cause and prejudice" was shown to overcome a procedurally defaulted *Brady* claim to allow for a state habeas corpus claim because the information was "deliberately concealed by the state" and was "not reasonably available to counsel" in earlier proceedings by reason of forces *external* to and outside the petitioner's control. 475 S.W.3d at 76–77. The State had never disclosed to the petitioner: the alleged *Brady* information its bail investigator had observed, a pretrial document the bail investigator had recorded the information on, and the pretrial release form that *was* disclosed had been deliberately altered by an unknown government agent where the relevant information had been "scratched out." *Id*. at 77.

In *Strickler*, in the context of federal habeas relief, the United States Supreme Court held that the "combination" of three factors sufficed to establish "cause" for failure to previously raise a *Brady* claim in state court where: (1) the prosecution withheld exculpatory evidence; (2) the petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's *Brady* obligation related to trial; and (3) the state confirmed petitioner's reliance by asserting during state habeas proceedings that the petitioner had already received "everything known to the government." 527 U.S. at 289. The Court in *Strickler* made clear that the *Brady* claim could proceed because prior counsel was "not aware of the factual basis" for the claim when the undisclosed *Brady* material—records pertaining to police interviews of a witness and notes from that witness sent to a detective—were wholly within the "hands" of the government and likely could not have been discovered through collateral proceedings on the basis of "mere suspicion that some prosecutorial misstep may have occurred." *Id*. at 286–89.

Here, to the extent they could apply in this post-conviction context, *Amadeo*, *Clemons*, and *Strickler* do not support the conclusion that Abdullah's first post-conviction counsel reasonably could not or should not have known about the alleged *Brady* information reflected by the POST materials in 2007. The POST materials were documents openly available through a public records request as demonstrated by their prompt same-day release to Abdullah's federal habeas counsel in 2020—unlike the documents plainly not available or intended for public consumption in *Amadeo*. Abdullah also has not shown the POST materials were "deliberately concealed" by forces external

19

to Abdullah and his prior counsel through nondisclosure and alteration, like the circumstances in *Clemons*. Furthermore, Abdullah has not shown that the POST materials—which Abdullah's first post-conviction counsel had notice of from Littlefield's 2007 deposition—were non-public documents solely within the hands of the government, with no reason to suspect of their existence, like the circumstances in *Strickler*.

Instead, like the circumstances in *Porter*, 136 Idaho at 261–62, 32 P.3d at 155–56, Abdullah's first post-conviction counsel reasonably could or should have known about Abdullah's *Brady* and ineffective assistance claims in 2007. Abdullah's prior counsel had notice of the POST investigation and decertification of Littlefield because of Littlefield's affair with Klein. Nevertheless, Abdullah's counsel did not request any information from POST on Littlefield until 2020, thirteen years later. Our decision in *Pizzuto v. State*, 134 Idaho 793, 798, 10 P.3d 742, 747 (2000), supports the same conclusion where we held that a *Brady* claim was barred because the underlying information reasonably could or should have been known by prior counsel had they reviewed the case files of Pizzuto's co-defendants—which were publicly available records Pizzuto's prior counsel knew existed, but did not review for the relevant information.

Abdullah also makes a passing effort at challenging the constitutionality of the time-bar in Idaho Code section 19-2719(5) as violative of due process to the extent it precludes the airing of *Brady* claims which reasonably could have been brought in a prior petition. As explained above, "even if the State violated a petitioner's right to due process by withholding evidence, the petitioner [is still] required to raise this issue, like other constitutional issues, within the time frame mandated by I.C. § 19-2719." *Porter*, 136 Idaho at 261, 32 P.3d at 155; *McKinney*, 133 Idaho at 706–07, 992 P.2d at 155–56; *Rhoades*, 120 Idaho at 806–07, 820 P.2d at 676–74 (upholding the constitutionality of the general time-bar against capital petitioners under section 19-2719 under a procedural due process challenge); *Pizzuto*, 149 Idaho at 165, 233 P.3d at 96 (explaining that the issue is "settled"—Idaho Code section 19-2719 does not violate the Due Process Clause of the United States and Idaho Constitutions). Thus, an extensive discussion on Abdullah's challenge here is unnecessary because it has already been rejected.

In sum, Abdullah's *Brady* and alternative ineffective assistance of trial counsel claims are time-barred by Idaho Code section 19-2719(5)(a). Both claims are based on the same six items of alleged *Brady* information, all reflected in the POST materials, which were reasonably knowable and discoverable in 2007, when Abdullah's first post-conviction counsel was investigating the

details of Littlefield's affair. Therefore, the district court did not err in deeming the claims waived under section 19-2719(5).

**B. In the alternative, Abdullah's claims fail on the merits because the impeachment information is not material under *Brady*, nor was trial counsel's alleged failure to investigate and discover the information prejudicial under *Strickland*.**

Alternatively, we also independently affirm summary dismissal on the merits. Assuming Abdullah's *Brady* and ineffective assistance claims are: (1) not time-barred by Idaho Code section 19-2719(5)(a); (2) supported by admissible evidence (i.e., the POST materials) to provide a factual basis for the claims; and (3) the six items of alleged *Brady* information are factually true—both claims lack merit. First, even if the information is admissible impeachment fodder that was suppressed by the State, it is not material under *Brady*. Second, even if it were deficient performance for trial counsel to fail to investigate the details of Littlefield's affair and discover the alleged *Brady* information, trial counsel's error is not prejudicial under *Strickland*.

This Court previously addressed the requirements to establish a *Brady* violation in *State v. Lankford*: "In order to establish a *Brady* violation, there must be evidence that (1) is favorable to the accused because it is either exculpatory or impeaching; (2) was willfully or inadvertently suppressed by the State; and (3) was prejudicial or material in that there is a reasonable probability that its disclosure to the accused would have led to a different result." 162 Idaho 477, 503, 399 P.3d 804, 839 (2017) (citing *State v. Shackelford*, 150 Idaho 355, 380, 247 P.3d 582, 607 (2010) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Kyles v. Whitley*, 514 U.S. at 433)). "'Reasonable probability' of a different result is shown when the suppression 'undermines confidence in the outcome of the trial.'" *Lankford*, 162 Idaho at 503, 399 P.3d at 839 (citing *Shackelford*, 150 Idaho at 380, 247 P.3d at 607 (quoting *Kyles*, 514 U.S. at 433)).

The materiality prong of a *Brady* analysis is essentially a question of fairness: whether the defendant, in the absence of the suppressed evidence, received "a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. "Reasonable probability" of a different result does not require the defendant to prove by a preponderance of the evidence that he would have received a different verdict had he received a trial with the suppressed evidence. *Id*. Rather, "confidence in the verdict" is evaluated by the net effect of the suppressed favorable information, which must be considered "collectively, not item by item," *see Kyles*, 514 U.S. at 436, under a "the totality of the circumstances" analysis. *See United States v. Bagley*, 473 U.S. 667, 683 (1985). Whether the favorable information is "material" is a question of law, over which we exercise free review. *Porter*

*v. State*, 136 Idaho 257, 261, 32 P.3d 151, 155 (2001). In post-conviction actions, materiality can be determined at summary dismissal, without a full evidentiary hearing, by assuming the truth of the factual allegations. *See State v. Hall*, 163 Idaho 744, 832, 419 P.3d 1042, 1130 (2018).

Related to the ineffective assistance of trial counsel claim, "[t]his Court analyzes state and federal constitutional claims for ineffective assistance of counsel under the two-prong test set forth in *Strickland* [*v. Washington*, 466 U.S. 668, 687 (1984)][.]" *Dunlap v. State*, 159 Idaho 280, 296, 360 P.3d 289, 305 (2015); *Abdullah II*, 169 Idaho at 725, 503 P.3d at 196. "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. If a petitioner fails to satisfy one prong of *Strickland*, there is no need to address both prongs before we can conclude the ineffective assistance claim fails on the merits. *See Hall*, 163 Idaho at 816, 419 P.3d at 1114.

The prejudice prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Abdullah II*, 169 Idaho at 725, 503 P.3d at 196 (quoting *Strickland*, 466 U.S. at 687). In other words, "[t]o prove that counsel's deficient performance prejudiced the defendant, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Dunlap*, 159 Idaho at 297, 360 P.3d at 306 (quoting *Strickland*, 466 U.S. at 694). When the alleged impeachment evidence underlying a *Brady* claim and an ineffective assistance of counsel claim is the same, the standard for showing materiality under *Brady* and prejudice under *Strickland* is the same. *Gentry v. Sinclair*, 705 F.3d 884, 906 (9th Cir. 2013) (holding an ineffective assistance claim for failure to investigate and discover the same impeachment information underlying Gentry's *Brady* claims failed for lack of prejudice when the same information was not material under *Brady*); *Marshall v. Hendricks*, 307 F.3d 36, 53 (3d Cir. 2002) ("The standard for materiality [under *Brady*] is the same as that iterated in *Strickland v. Washington*, 466 U.S. 668, 694 (1984)."). Accordingly, because both of Abdullah's claims are based on the same six items of impeachment information against Littlefield, if Abdullah cannot show materiality under *Brady*, he cannot show prejudice under *Strickland*.

Abdullah argues that the six items of alleged *Brady* information could have been used to impeach Littlefield's credibility *so* effectively at trial that it would create a reasonable probability of a different result for purposes of guilt or punishment. Abdullah maintains that "conduct by a

detective who is repeatedly insubordinate, who violates direct orders after being warned that his conduct is placing a capital murder trial in jeopardy, who engages in sexual acts in the workplace with a prosecutor and in a room with evidence no less, and who is suspended mid-trial for that repeated insubordination, reflects adversely on his credibility." Given Littlefield's "central" position in the investigation against Abdullah before trial, and Littlefield's role in providing testimony at trial during the guilt and penalty phases, Abdullah maintains that he has proven materiality under *Brady* and prejudice under *Strickland*.

In response, the State points to the physical evidence, and testimony admitted against Abdullah at trial that is wholly unrelated to Littlefield's credibility and the details flowing from Littlefield's affair with Klein. The State explains that none of this evidence showing guilt would change even if Littlefield were successfully impeached on the grounds that he had a motive to slant the results of his investigation in favor of the State to curry favor with the deputy prosecutor, to promote the deputy prosecutor's career, to save his own job, or to otherwise fail to act impartially based on the six items of alleged *Brady* information. Overall, the State maintains that the alleged *Brady* information is neither material nor prejudicial on guilt or punishment. We agree with the State.

The United States Supreme Court has "observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012) (citing *United States v. Agurs*, 427 U.S. 97, 112 n.21 (1976)). In contrast, where an eyewitness provides the only evidence linking the defendant to a crime, then materiality might be shown when the prosecution suppresses statements made by that eyewitness which were favorable to the defendant. *See Cain*, 565 U.S. at 74–76; *see also Agurs*, 427 U.S. at 113 ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."). On this note, the Ninth Circuit Court of Appeals has similarly held that "impeachment evidence is material 'if it could have been used to impeach a key prosecution witness sufficiently to undermine confidence in the verdict.'" *Comstock v. Humphries*, 786 F.3d 701, 711 (9th Cir. 2015) (citation omitted).

In addition, favorable information may be material for purposes of *Brady* when it amounts to "withheld information created by government agents directly relating to the culpability of *one of the government agents*" as the true perpetrator of the crime. *See Grube v. Blades*, No. CV-01-357-S-BLW, 2006 WL 297203, at *15 (D. Idaho Feb. 6, 2006) (emphasis added). In a 3-2 split

decision, this Court, in *Grube v. State*, 134 Idaho 24, 27–30, 995 P.2d 794, 797–800 (2000), affirmed the dismissal of a petition for post-conviction relief after concluding, among other things, that the *Brady* claim failed on materiality. However, on federal habeas review, the United States District Court for the District of Idaho explained that this Court had applied an incorrect *Brady* standard, and after applying the correct standard, determined that the cumulative effect of the suppressed information *was* material. *See Grube*, 2006 WL 297203, at *16–22.

In *Grube*, there were three pieces of withheld information: (1) a witness's observations of Grube's reaction to the victim's death; (2) the same witness's observation of the other suspect—a police officer—near the victim's residence at 2:30 a.m. on the night of the victim's murder (a contradiction of the police officer's alibi); and (3) the police log for the night of the murder had been deliberately altered to change the number of miles traveled that night. *Id*. at *7. The federal district court concluded the withheld information was material because it went to the exact issue the jury had to decide to reach a finding of guilt: whether Grube murdered the victim, *or* the police engaged in a cover-up to protect the victim's true killer. *Id*. at *18, *21 (explaining that the *Brady* information is material because it is not regarding "a third party witness or random circumstantial evidence," but directly implicates "as the perpetrator of the murder one of the police officers who conducted the investigation").

Here, to reiterate, the six items of impeachment information against Littlefield, underlying both the *Brady* and ineffective assistance claims, are as follows:

(1) "Littlefield and Klein performed sex acts in the workplace and while both were on duty, including in the 'war room' at the Ada County Prosecutor's Office, where evidence from the Abdullah case was stored, as well as in Littlefield's squad car and Klein's office";

(2) "Littlefield repeatedly defied direct orders from his superiors before and during trial, including from the police chief, to break off all contact with Klein";

(3) "Littlefield had harassed and stalked Klein after she ended their relationship, for which Klein's husband—who was a Deputy Sheriff—wished to press charges against Littlefield";

(4) "Internal Affairs opened an investigation into the relationship on August 25, 2004";

(5) "Command Staff of both the BPD and the Ada County Sheriff's Office had concerns that the affair would generate workplace violence, since both Littlefield and Klein's husband were armed"; and

(6) "Littlefield was suspended from duty on October 23, 2004, in the midst of trial."

24

Relying on Littlefield's misconduct related to his affair with Klein, insubordination to his superiors, and certain speculative conclusions about Klein's husband's intent to press criminal charges against Littlefield—Abdullah argues, "[a] jury could well believe that Littlefield might be biased in favor of the prosecution in order to avoid criminal charges or in an attempt to save his job." As for Littlefield's alleged mid-trial suspension, Abdullah adds that this information could have been used to impeach Littlefield during trial on whether he was still a detective with the Boise Police Department, and to illuminate his employment and discipline status. However, even if Abdullah's trial counsel fully impeached Littlefield with this information, its cumulative effect is far less than in *Cain*, where the prosecution's case turned on the credibility of a single witness connecting the defendant to the crime, or in *Grube*, where the withheld information directly implicated one of the investigating police officers as the true perpetrator. Instead, the cumulative effect of impeaching Littlefield with the above information would be de minimis.

To explain, Littlefield testified across six days during the guilt phase of Abdullah's trial. However, Littlefield did not testify as a substantive or eyewitness to prove Abdullah's guilt. Instead, much of Littlefield's testimony provided foundation and established the chain of custody for other physical and substantive evidence admitted against Abdullah to prove guilt. For example, Littlefield's personal knowledge and testimony was used to admit a taped interview of Abdullah after his arrival at the airport, and another interview of Abdullah by law enforcement two days later. Both interviews were played for the jury. Littlefield's testimony was also used to admit a gas receipt demonstrating how many gallons of gasoline Abdullah's vehicle could hold; the collection and chain of custody regarding other gasoline evidence recovered and later tested; items seized during the search of Abdullah's vehicle; and that a blood draw was taken from Abdullah.

Importantly, impeaching Littlefield on the alleged *Brady* information to suggest bias would *not* have: impeached or affected the video of Abdullah and his son carrying two red plastic gas cans out of a store in Salt Lake City, Utah, the afternoon before the murder; affected the fact that an identical gas can was found at the scene the next morning; changed the fact the jury saw and heard evidence that Abdullah filled both gas cans with gasoline purchased in Salt Lake City the evening before the murder and arson; changed the fact that Abdullah had purchased more gasoline than could fit into the tank of his vehicle; impeached Imam Din's testimony that Abdullah had called him to ask him to purchase similar red gas cans, fill them with gas, and leave them in his van parked in front of the imam's house located in Salt Lake City; impeached the evidence that

25

Abdullah had purchased an adult sized cape and mask in Salt Lake City the day before the murder or that an identical cape had been found at the scene; changed the DNA evidence on the cape from which Abdullah could not be excluded as a minor contributor; changed the evidence that the gas remnants in the gas can found at the scene matched a unique chemical signature of the gas Abdullah had purchased in Salt Lake City the day before the arson and murder; impeached the testimony and evidence that Abdullah purchased an insurance policy for vending machines stored in the garage of the Abdullah residence just one and a half months before the arson and murder; impeached the fact that Abdullah insisted he only wanted coverage for fire—nothing else; changed the evidence of Abdullah's singed hair on both arms after the arson and murder; or impeached the testimony from an eyewitness who saw Abdullah outside of Mountain Home, Idaho, in time to commit the underlying crimes. *See Abdullah I*, 158 Idaho at 405–12, 509, 348 P.3d at 20–27, 124.

The impeachment of Littlefield on the alleged *Brady* information would also not change the evidence of Abdullah's and Angie's troubled marriage, or the statements Abdullah made to a co-worker that "it was acceptable to kill one's wife or to have the wife killed in his culture if she cheated on the husband and the husband made an offering to the wife's family." *Id*. at 406, 348 P.3d at 21. It would not change the evidence that Abdullah's eighteen-month-old "favorite" son, *id*. at 407, 348 P.3d at 22, was found outside the burning home sitting on a comforter from the master bedroom—with no signs of having been in a fire—despite the son's inability to open the master bedroom door or carry the comforter himself, *id*. at 408, 348 P.3d at 23. It would not change that the front door of Abdullah's home was "open with no signs of a forced entry," even though the lock had been checked earlier that night. *Id*. It would not change the redacted letter from Angie confronting Abdullah, read to the jury to show Angie's state of mind regarding, among other things, her relationship with Abdullah. *Id*. at 411–12, 348 P.3d at 26–27. Finally, it would not impact the evidence that Angie was found with a plastic bag over her head that matched plastic bags from India Emporium—a store "where Abdullah had been three days before Angie's death and received a similar plastic bag." *Id*. at 410, 348 P.3d at 25.

Contrary to Abdullah's characterization of it on appeal, the prosecution's case, notwithstanding the dispute on the causal effect of Prozac found in Angie's blood, *id.* at 401–11, 348 P.3d at 25–26, was not a "weak" case for Abdullah's guilt. We conclude that based on the physical evidence and testimony that would remain unchanged and unaffected by even a full impeachment of Littlefield with the six items of alleged *Brady* information, there is not a

26

reasonable probability that, had the six items of information been disclosed for use at trial, the result of the guilt phase would have been different. Thus, the alleged impeachment information is neither material under *Brady* nor prejudicial under *Strickland*.

As noted above, Abdullah also argues that if materiality and prejudice requirements are not satisfied with respect to the guilt phase, they are satisfied for purposes of the penalty phase. However, as the State points out, Abdullah raises this penalty phase argument for the first time on appeal. Abdullah's Amended Petition itself did allege that the impeachment information against Littlefield, "in conjunction with the other serious defects in the State's case, would have given at least one juror enough doubt about Abdullah's guilt to vote against death at sentencing." However, nowhere in Abdullah's pleadings or briefing below, or during the hearing on the motion to dismiss below, did Abdullah present any argument or authority in support of this materiality and prejudice during the penalty phase. Thus, whether the information is material and prejudicial for purposes of the penalty phase has been waived; moreover, it was only mentioned in passing and unsupported by cogent argument or authority in the appeal briefing. *See State v. Gonzales*, 165 Idaho 667, 672, 450 P.3d 315, 320 (2019).

In the alternative, we independently conclude that Abdullah's penalty phase argument fails on the merits. During the penalty phase, the jury unanimously found beyond a reasonable doubt the existence of two statutory aggravating circumstances: (1) Abdullah knowingly created a great risk of death to many persons (great risk aggravator); and (2) by the murder or circumstances surrounding its commission, Abdullah exhibited an utter disregard for human life (utter disregard aggravator). *Abdullah I*, 158 Idaho at 461–64, 348 P.3d at 76–79. The jury then "weighed the great risk aggravator and utter disregard aggravator individually against all mitigating circumstances and found that the mitigating circumstances were not sufficiently compelling that the death penalty would be unjust." *Id*. at 461, 348 P.3d at 76.

Before the jury reached this finding, "[n]umerous witnesses testified on Abdullah's behalf." *Id*. at 489–90, 348 P.3d at 104–05 (summarizing testimony); *see id*. at 413, 348 P.3d at 28 (listing nine witnesses who presented mitigating evidence through testimony). As we explained in *Abdullah I*, the mitigation testimony put on by Abdullah's trial counsel provided extensive information to the jury on Abdullah's background, upbringing, and character:

> [Abdullah's trial counsel] uncovered mitigation evidence from family members and acquaintances who testified to the oppressive environment in which Abdullah was raised and the hardships he endured while in refugee camps. Further, [trial counsel]

> elicited testimony regarding atrocities experienced by Abdullah's family members and fellow villagers. [Trial counsel] hired an expert on Abdullah's Kurdish heritage who testified in depth about the culture in which Abdullah was raised, the brutal regime of Saddam Hussein, and the persecution of the Kurdish people. In addition, [trial counsel] called witnesses to attest to Abdullah's good character in general and his model behavior as an inmate following his arrest.

*Id*. at 494–95, 348 P.3d at 109–10.

In contrast, apart from relying on the evidence of the crimes from the guilt phase, the State presented aggravating evidence from two witnesses during the penalty phase: (1) Littlefield; and (2) Steven Bankhead, an inmate at Idaho State Correctional Institution. *Id*. at 412–13, 348 P.3d at 27–28. Like his role during the guilt phase, Littlefield again played a limited foundation-type role: he testified that he had interviewed Bankhead in connection with the Abdullah investigation, that he had made no promises to Bankhead, and that Bankhead had asked for no favors in return for providing testimony against Abdullah at trial.

Instead, it was Bankhead who provided the substantive testimony: Bankhead testified that—prior to the murder of Angie, attempted murder of the children, and arson—Abdullah had asked Bankhead to kill Angie. *Id*. at 413, 348 P.3d at 28. Bankhead testified that Abdullah provided a "vial of a chemical to knock Angie unconscious and told him to rape her and cut her throat with a knife, also provided by Abdullah." *Id*. Bankhead also testified that Abdullah paid him $1,000 in cash to kill Angie. *Id*. Bankhead testified that he did not go through with Abdullah's plan. *Id*. Instead, he left town after disposing of the knife and chemical vial. *Id*.

Based on the extensive mitigation evidence Abdullah put on, and the limited role of Littlefield in testifying during the penalty phase, we conclude that there is not a reasonable probability that, had Littlefield been impeached on the six items of alleged *Brady* information, the result of the penalty phase would have been different. The impeachment of Littlefield to show bias, had it occurred during the penalty phase, would have had no effect on the mitigating evidence. It also would have had no effect on Bankhead's testimony that Abdullah had a prior plan to murder Angie—*or* the physical and testimonial evidence put on during the guilt phase demonstrating the heinous nature of Abdullah's crimes.

In other words, there is not a reasonable probability that, had the impeachment of Littlefield on the six items of alleged *Brady* information been *allowed* during the penalty phase, Littlefield's impeachment on that basis would have created a "residual doubt" about Abdullah's guilt, or the aggravating circumstances of his crimes, sufficient to avoid a sentence of death. *See Lockhart v.*

*McCree*, 476 U.S. 162, 181 (1986) (acknowledging that where there is a unitary jury, some capital defendants can benefit from "residual doubts" in the penalty phase to avoid a death sentence); *but see Abdul-Kabir v. Quarterman*, 550 U.S. 233, 250–51 (2007) ("[W]e have never held that capital defendants have an Eighth Amendment *right* to present 'residual doubt' evidence at sentencing[.]") (emphasis added); *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997) (explaining that during the penalty phase, "lingering doubt" evidence is not "germane to mitigation" and there is no *right* to present such evidence to disprove the presence of an aggravating circumstance).

As we have said before, "the brutal and callous nature in which Abdullah perpetrated this crime cannot be ignored." *Abdullah I*, 158 Idaho at 495, 348 P.3d at 110. "[I]n most, if not all, capital cases much of the evidence adduced at the guilt phase of the trial will also have a bearing on the penalty phase." *Lockhart*, 476 U.S. at 181. During the guilt phase, the jury found beyond a reasonable doubt that "Abdullah premeditated the murder of his wife, placed a bag over her head to asphyxiate her, poured gasoline throughout their home, and left three children inside a home engulfed in flames to cover up his actions." *Abdullah I*, 158 Idaho at 495, 348 P.3d at 110.

At a minimum, the jury's finding of the utter disregard aggravator, supporting the sentence of death, is evidenced by the brutal nature of Abdullah's crime. After extensive mitigation evidence was presented by Abdullah, the jury did not find the mitigating circumstances "sufficiently compelling" when compared to the aggravating factors such that the death penalty would be unjust. *See id*. at 461, 348 P.3d at 76. For these reasons, there is not a reasonable probability that, had Littlefield been impeached on the six items of alleged *Brady* information during the penalty phase, the result would have been different. Thus, the impeachment information against Littlefield is neither material under *Brady* nor prejudicial under *Strickland* for purposes of the penalty phase.

## C. Whether the district court erred in denying Abdullah discovery is moot because even if the facts underlying his two claims are true, Abdullah is not entitled to relief.

On appeal, Abdullah also challenges the district court's decision to deny him discovery on his *Brady* and ineffective assistance claims before summarily dismissing his Amended Petition as an abuse of discretion. "The decision to authorize discovery during post-conviction relief is a matter left to the sound discretion of the district court." *State v. Hall*, 163 Idaho 744, 833, 419 P.3d 1042, 1131 (2018) (quoting *Raudebaugh v. State*, 135 Idaho 602, 605, 21 P.3d 924, 927 (2001)). "Unless discovery is necessary to protect an applicant's substantial rights, the district court is not

required to order discovery." *Baldwin v. State*, 145 Idaho 148, 157, 177 P.3d 362, 371 (2008). However, in this case, we do not reach this discovery issue because Abdullah's challenge is moot.

In reaching our alternative and independent conclusions above that Abdullah's two claims are time-barred and otherwise fail on the merits, we assumed the truth of the factual allegations underlying both claims. In other words, we assumed the truth of the six items of alleged *Brady* information to conclude Abdullah is not entitled to relief. Because post-conviction is "a forum for known grievances, not an opportunity to research for grievances[,]" *Abdullah I*, 158 Idaho at 482, 348 P.3d at 97, there is no reason Abdullah requires discovery when he is not entitled to relief even if the facts underlying his claims are true. Therefore, whether the district court erred in denying Abdullah's motion for discovery to factually support his claims is moot.

## IV. CONCLUSION

For the reasons set forth above, the judgment and decision of the district court summarily dismissing Abdullah's Amended Petition is affirmed.

Chief Justice BEVAN, and Justices STEGNER, MOELLER and Justice Pro Tem VANDERVELDE CONCUR.